692 P.2d 370

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Thomas LOPEZ, Guadalupe Lopez, and Julian Lopez, Defendants-Appellants.**

No. 14251.

Court of Appeals of Idaho.

Nov. 26, 1984.

E.R. Frachiseur, Hicks & Frachiseur, Mountain Home, for defendants-appellants.

Jim Jones, Atty. Gen., by Lynn E. Thomas, Sol. Gen., and Steven W. Berenter (argued), Deputy Atty. Gen., Boise, for plaintiff-respondent.

BURNETT, Judge.

This is an appeal by three brothers, Thomas, Guadalupe and Julian Lopez, who stand convicted of burglary. The principal issue is whether the jury that convicted them was drawn from a fair cross section of the community. We also are asked to decide whether the trial court erred by failing to suppress evidence seized during searches of an automobile, by allowing testimony from witnesses whose identities had not been disclosed before trial, and by refusing to dismiss charges after the prosecutor allegedly interfered with trial preparation by the defense. For reasons explained below, we affirm the judgments of conviction.

I

We first examine the jury selection issue. Appellants contend that the selection process was constitutionally infirm because the pool of potential jurors, from which the jury panel was drawn, underrepresented the Hispanic population of Elmore County. Appellants also claim that the selection process violated certain requirements of the Uniform Jury Selection and Service Act, codified at title 2, chapter 2, of the Idaho Code. We will address the constitutional and statutory challenges in turn.

A

The fourteenth amendment to the United States Constitution provides in pertinent part that no state may "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The sixth amendment, made applicable to the states through the due process clause of the fourteenth amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... trial, by an impartial jury...." Similar rights are secured by article 1, § 7, and by article 1, § 13, of the Idaho Constitution. With respect to this appeal, we will treat the state constitutional rights as coextensive with those provided in the federal constitution.

Appellants have based their constitutional challenge broadly upon both the sixth and fourteenth amendments. However, it is unnecessary to apply these amendments separately. The history of constitutional

litigation over jury selection reveals that both due process and the right to an impartial jury have evolved toward a common requirement—selection of the jury from a fair cross section of the community. This evolution is illustrated by four landmark cases. In *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), the United States Supreme Court adopted what came to be known as a rule of exclusion, declaring that due process was offended by discrimination in the selection of jurors. The Court held that a prima facie case of such discrimination could be established by showing exclusion of virtually all qualified persons in a substantial segment of the general population, during an extended period of time. In *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Supreme Court intimated that the rule of exclusion might be broadened to embrace underrepresentation. The Court held that due process and the right to an impartial jury were grounded in the "concept of the jury as a cross-section of the community." 315 U.S. at 86, 62 S.Ct. at 472. Three decades later, in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Court explicitly held that both the fourteenth and sixth amendments require a jury to be chosen from a fair cross section of the community. Finally, in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Court explained that a violation of the fair cross section requirement could be established by showing:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364, 99 S.Ct. at 668. The Court noted that "systematic exclusion" means "underrepresentation ... inherent in the particular jury-selection process utilized." 439 U.S. at 366, 99 S.Ct. at 669. When such a prima facie case has been established, the burden is upon the government to show that the disparity is justified by a significant state interest. 439 U.S. at 367–68, 99 S.Ct. at 670.

■ Accordingly, our inquiry in this case is whether appellants have made a prima facie showing of underrepresentation inherent in the Elmore County jury selection process and, if so, whether the disparity has been justifiably explained by the state. An evidentiary hearing was conducted by the district court. The judge ruled that no prima facie case had been established. However, we are not bound by that determination. Although the district judge is the finder of basic facts, an appellate court must independently decide whether those facts show a violation of the fundamental constitutional rights at issue here. *See Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (implicitly rejecting suggestion, made in dissent by Justice Stewart, that a trial court finding of failure to make a prima facie case of jury under representativeness should be reviewed under "clear error" standard). Consequently, it is our duty to examine the record in light of the requirements articulated in *Duren v. Missouri, supra*.

i

■ The first *Duren* requirement is to identify a "distinctive group" in the community. Appellants have identified Hispanics as the subject group and have described the group by reference to Spanish-surnamed persons. It is well settled that Hispanic people represent a distinctive group in the population. *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). The use of Spanish surnames to identify this group is acceptable. *Montoya v. People*, 141 Colo. 9, 345 P.2d 1062 (1959). Consequently, the first *Duren* test is satisfied.

ii

The next test is whether the representation of Hispanics in the jury pool was "fair

and reasonable in relation to the number of such persons in the community." Through the laborious and commendable efforts of their counsel, appellants presented substantial evidence on this question. Based upon the most recent census data, they established that the total population of Elmore County was 21,565, of which 1,776 or 8.2% were Hispanic. Appellants also proved that the Elmore County "master jury list," from which the "jury wheel" was derived and from which the panel in this case ultimately was drawn, consisted of 13,204 persons of whom 428 or 3.2% were Hispanic. Some 4,401 names actually were placed in the "jury wheel." Of these, 113 or 2.6% were Hispanic. From this "jury wheel" a quarterly jury list was prepared, comprising 314 persons of whom 11 or 12 (about 3.5%) were Hispanic. The jury panel was drawn from this quarterly list.

These figures demonstrate that the Hispanic percentage was relatively stable as the selection system progressed, by random selection, from the master jury list to the quarterly list. Consequently, appellants have not mounted their constitutional challenge against those stages of the process. Rather, their challenge has been directed at the entry level of the system, where we find the disparity between 8.2% Hispanic representation in the general population and 3.2% representation on the master jury list.

Neither the United States Supreme Court nor the Idaho Supreme Court has adopted a discrete standard for the maximum permissible deviation between representation in the community and representation in the entry-level jury pool. At one time, the United States Supreme Court suggested that "purposeful discrimination" could not be inferred from underrepresentation of ten percent or less. *Swain v. Alabama,* 380 U.S. 202, 208–09, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965). However, in nearly two decades since *Swain,* the Supreme Court has not expressly reiterated the ten percent guideline.

Because there is no single, overriding standard, the courts and commentators have developed varying methodologies for evaluating jury representativeness. The simplest approach is to measure the absolute difference between the proportion of the subject group in the general population and its proportion in the jury pool. This approach, known as the absolute disparity standard, lies at the heart of *Swain* and may be discerned in many other Supreme Court cases. The Court has held absolute disparities sufficient to create inferences of systematic underrepresentation in the following illustrative cases: *Duren v. Missouri, supra* (group represented 54% of community population but 15% of jury pool); *Castaneda v. Partida, supra* (79% of community, 39% of jury pool); *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (21% of community, 14% of jury pool, but only 7% of panel from which jury was drawn); *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 532 (1970) (60% of community, 37% of jury pool); *Jones v. Georgia,* 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (30.7% of community, 5% of jury pool); *Sims v. Georgia,* 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (24% of community, 5% of jury pool); and *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (42.6% of community, 9.1% of grand jury pool and 7.8% of petit jury pool). In each case the absolute disparity was greater than ten percent. Thus, while the ten percent guideline mentioned in *Swain* has not been explicitly followed, neither has it been repudiated.

Against this backdrop, if we were to rely solely upon the absolute disparity standard in this appeal, we would hesitate to hold that a disparity of approximately five percent (8.2% of the community, 3.2% of the master jury list) was sufficient to show a lack of "fair and reasonable" representation. However, the absolute disparity standard is not beyond criticism. It fails to take account of the range at which a measured disparity occurs. *See Foster v. Sparks,* 506 F.2d 805, 818–19, 834–35 (5th Cir.1975) (appendix by Gewin, J.); D. Kairys, J. Kadane and J. Lehoczky, *Jury Representativeness: A Mandate for Multiple*

*Source Lists,* 65 CAL.L.REV. 776, 793–99 (1977) (hereinafter cited as Kairys). The lower the range, the less protection is afforded by the absolute disparity standard. Thus, an absolute disparity of ten percent might not be viewed as excessive when applied to a group representing fifty percent of the community, but it would allow virtual exclusion of a small group, such as Hispanics in Elmore County, who comprise 8.2% of the population.

Three other tests—commonly termed the substantial impact test, the statistical significance test and the comparative disparity standard—have been developed. *See, e.g.,* Kairys, *supra,* at 790–801. Of these, the substantial impact test embraces a methodology so similar to the absolute disparity standard that we do not examine it separately here. The statistical significance test focuses upon the probability that a particular absolute disparity could occur by chance in a random drawing from the population. In this case appellants, without adverting explicitly to the statistical significance test, have followed a similar approach. They adduced testimony by an expert witness that there was less than one chance in one hundred thousand that a master jury list drawn at random from a community of 21,565 persons, of whom 1,776 belonged to a particular group, would result in only 428 members of that group being included among 13,204 persons on the master jury list.

In our view, this type of calculation is useful evidence that the underrepresentation is not merely a fleeting anomaly in an otherwise purely random selection scheme. Nevertheless, it is one thing to say that a probability calculation is useful evidence; it is quite another to say that it embodies a constitutional standard. The statistical significance test is descriptive, not normative. It simply tells us that Elmore County's jury selection system almost inevitably will fail to produce jury lists which are perfect cross-sectional representations of the community. However, as we have noted, the United States Supreme Court has held the sixth and fourteenth amendments to require a fair cross section, not a perfect

cross section. The Idaho Supreme Court implicitly has agreed. *See State v. Gerhardt,* 97 Idaho 603, 549 P.2d 262 (1976) *and State v. Pontier,* 95 Idaho 707, 518 P.2d 969 (1974) (both holding that criminal defendants have no constitutional right to a community balance, or representation of a particular group, among jurors selected for trial). Moreover, the statistical significance test is ill-suited to serve as a uniform standard in a variety of cases. It is affected by the size of the sample group and of the general population. It also produces low probabilities that even small disparities could occur at random. Kairys, *supra,* at 794.

We turn, then, to the comparative disparity standard. This criterion, unlike the absolute disparity standard, takes into account the size of the group as well as the absolute difference between the group's proportionate representation in the community and its representation in the jury pool. It accomplishes this by subtracting the percentage representation in the jury pool from the percentage representation in the community, dividing the difference by the percentage representation in the community, and multiplying by 100 to obtain a percentage result. Kairys, *supra,* at 790. This result measures the diminished likelihood that a member of the underrepresented group, when compared to the average person in the community, will be called to jury service. Thus, if a group constitutes ten percent of the community but only five percent of a jury pool, the diminished likelihood of serving on a jury is fifty percent (ten divided into the difference between ten and five). In the present case, the comparative disparity is 61% (8.2 divided into the difference between 8.2 and 3.2). In other words, when the data in this case were collected, an Hispanic person was 61% less likely than the average person in Elmore County to be called for jury service.

The comparative disparity standard has been acknowledged, though not explicitly adopted, by the United States Supreme Court. *See Alexander v. Louisiana, supra* (referring to absolute and comparative

disparities). The standard also has found favor among several lower courts. *See, e.g., People v. Harris,* 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433 (1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 365, 85 L.Ed.2d 301 (1985); *United States v. Goff,* 509 F.2d 825 (5th Cir.1975), *cert. denied,* 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975); *Stephens v. Cox,* 449 F.2d 657 (4th Cir.1971).

It has been suggested that the maximum permissible comparable disparity should be fifteen percent for groups comprising more than ten percent of the population, and twenty-five percent for smaller groups. Kairys, *supra,* at 796 n. 112. However, in none of the cases cited above has a maximum permissible level been specified. In *Harris* a showing of underrepresentation was held sufficient upon data for the year 1975 indicating a 53% comparative disparity for one group that constituted 11.6% of the general population, and a comparative disparity of 84% for another group that constituted 21.3% of the population. In *Stephens,* a 50% comparative disparity for a group constituting 30% of the general population also was held sufficient. However, in *Goff* a 20% comparative disparity for one group constituting 26.3% of the general population, and a 47.7% comparative disparity for another group constituting 10.5% of the population, were held insufficient.

If these cases have a common thread, it is that a comparative disparity well over 50% is strong evidence of underrepresentation cognizable under the sixth and fourteenth amendments. A comparative disparity of about 50% may or may not be adequate to show such underrepresentation, depending in part upon the size of the group in question. Finally, a comparative disparity well below 50% is unlikely to be sufficient, especially where the absolute disparity also is small.

■ We do not believe the comparative disparity standard has been sufficiently tested by experience to enable us to say with confidence that a specific level captures the essence of the Constitution. Neither do we believe that comparative dispari-

ty should be regarded as the sole measure of jury representativeness. It should be viewed in conjunction with absolute disparity. As noted by the California Supreme Court in *Harris:*

> We do not at this time adopt one method of measurement to the exclusion of the others. Rather, it will be helpful when possible in any particular case to compare the results under the various techniques in deciding whether a particular disparity suggests a constitutional violation.

201 Cal.Rptr. at 787 n. 2, 679 P.2d at 438 n. 2.

■ In the present case, the composite picture is that Hispanics, who accounted for 8.2% of the Elmore County population, were underrepresented in the jury pool by an absolute disparity of five percent and were 61% less likely than the average members of the community to be called for jury service. We hold that these figures, taken together, are sufficient to show a lack of "fair and reasonable" representation in the sense denoted by the second test of *Duren v. Missouri, supra.*

### iii

■ The final *Duren* test is whether the underrepresentation of Hispanics is due to "systematic exclusion"—that is, whether it is "inherent" in the Elmore County jury selection process. This question largely has been answered by our discussion of the statistical significance test. The evidence is undisputed that the underrepresentation demonstrated in this case would appear less than once in 100,000 occurrences of compiling a master jury list entirely at random from the general population. It is also undisputed that the master jury list, the "jury wheel" and the quarterly list all were constructed in accordance with procedures routinely followed by the county's jury commissioners. The only reasonable inference from this evidence is that the underrepresentation of Hispanics was inherent in those procedures. The third *Duren* test has been satisfied. We conclude that appellants have made a prima facie

case for violation of the fair cross section requirement.

### iv

When a prima facie case has been established, *Duren* imposes upon the state an obligation to justify the underrepresentation. However, before turning to the state's justification in this case, we deal with two residual questions concerning the prima facie case.

■ First, the state has argued that appellants' proof is inadequate because it rests upon statistics showing Hispanic representation in the general population rather than Hispanic representation in that part of the population eligible for jury service. There may be conceptual merit in requiring jury-eligible data rather than accepting general population data. One federal court has modified the comparative disparity test to reflect proportions of eligible persons rather than proportions of the general population. *See United States v. McDaniels*, 370 F.Supp. 298 (E.D.La.1973), *aff'd*, 509 F.2d 825, *cert. denied*, 423 U.S. 857 (1975). However, the United States Supreme Court knowingly has refrained from compelling criminal defendants to compile jury-eligible data in order to show prima facie violations of the fair cross section requirement. In *Castaneda v. Partida, supra*, a majority of the Supreme Court upheld a lower court finding of a prima facie violation, using general population statistics. A dissenting opinion argued unsuccessfully that *"eligible* population statistics, not gross population figures, provide the relevant starting point." 430 U.S. at 504, 97 S.Ct. at 1285 (emphasis original). There is a sound pragmatic reason for the majority view. The California Supreme Court in *People v. Harris, supra,* recently observed:

> [B]ecause of the difficulty in obtaining more accurate figures for jury eligibility, the defendant can present a prima facie case by showing through the use of total population figures a significant under-representation of a cognizable class. The burden then shifts to the state to demonstrate ... that with more refined statistics, the underrepresentation would be reduced to a constitutionally insignificant disparity ....

201 Cal.Rptr. at 786, 679 P.2d at 437. We, too, accept the majority position in *Castaneda*.

■ The second question is one raised by the district judge. He said he was "just not comfortable" with efforts made by appellants to distinguish in their statistics between Basques and other Hispanics. There are, of course, strong cultural differences between these groups. Appellants used an expert witness to identify Basques through name identification. The judge did not identify any specific deficiencies in the technique used by appellants. Neither did the state offer a specific alternative. Our examination of the record persuades us that the method employed for distinguishing Basques from other Hispanics was reasonable. Any impreciseness of the method was unlikely to make a constitutionally significant difference in measuring the disparity between Hispanic representation on the master jury list and representation in the general population.

### v

We now turn to the question whether the state, having been confronted with a prima facie case of jury underrepresentation, presented sufficient evidence to justify the disparity. As noted above, it is clear from appellants' own data that the disparity consisted entirely of the difference between the proportion of Hispanics in the general population and the proportion in the master jury list. There was no showing of significant attrition in Hispanic representation as the selection system proceeded from the master jury list to the quarterly list from which the jury panel was drawn. Consequently, although the prosecutor suggested that the disparity might be justified by statutory juror qualifications, this suggestion was largely inapposite. The disparity at issue was that which appeared in the entry-level jury pool, not at any subsequent point in the process where juror qualifications other than age would be determined.

However, the prosecutor also presented uncontroverted evidence that the master jury list had been prepared in compliance with I.C. § 2–206(1). This statute requires the jury commission in each county to maintain a master list "consisting of all voter registration lists for the county supplemented with names from other lists of persons resident therein ... which the [Idaho] Supreme Court from time to time designates." Our Supreme Court has designated drivers' licenses as a supplemental list. Elmore County used a list of adult licensed drivers, in addition to voter registration lists, in preparing the master jury list. We infer, and the state has not disputed, that the disparity of Hispanics on the master jury list is directly attributable to under-representation of Hispanics on these source lists.

The state has a significant interest in maintaining an efficient, practical jury selection system. Jury commissioners cannot be expected to use every conceivable source list. The source lists must be reliable, routinely available and unbiased.

In the hearing below, the prosecutor presented expert testimony concerning source lists. The witness, a jury commissioner in neighboring Ada County, had been involved in a jury usage and management study encompassing Boise and seventeen other cities throughout the United States. He also had participated in implementing the Uniform Jury Service and Selection Act in Idaho. He testified that sources of potential jurors, in addition to those disclosed by voter registration lists and by the adult drivers' license list, had been considered. Among them, federal census, social security, income tax and public assistance lists had been found unavailable—presumably due to confidentiality or other statutory restrictions. City directories were found to be incomplete and biased against low income people. Motor vehicle registrations were found to be contaminated by corporate or other institutional listings. Real property tax ledgers, telephone directories and utility lists were found to be biased against women or to be contaminated by inclusion of persons not residing in the county. The witness further noted that most states using multiple lists under the Uniform Jury Service and Selection Act ultimately had narrowed their sources to voter registration and adult drivers' licenses. This testimony is consistent with survey information presented in Kairys, *supra*, at 823. Indeed, it appears that Idaho's supplementation of the voter registration list put it among the first states to use multiple sources. *See* Note, *Voter Registration Lists: Do They Yield a Jury Representative of the Community?* 5 U.MICH.J.L.REF. 385, 398–402 (1972).

The critical test for the sufficiency of source lists is their inclusiveness—the proportion of the population presumably eligible for jury service which the lists include. It has been suggested that any single source list, or set of source lists, less than 80% inclusive should be deemed inadequate unless justified in terms of voter eligibility or availability. *See* Kairys, *supra*, at 815–16. The evidence in the present case suggests that the Idaho system, as followed in Elmore County, satisfies the inclusiveness test. Appellants' evidence showed that of 21,565 persons comprising the general population of Elmore County, 8,605 were under nineteen years of age. Of the latter number, if approximately 8,000 also had been under the age of eighteen years and therefore ineligible to serve on juries, then 13,565 (the difference between 21,565 and 8,000) would represent the presumptively jury-eligible population. As noted earlier, Elmore County had included on its master jury list a total of 13,204 names. These figures, although inexact, suggest a high degree of inclusiveness.

In light of all the evidence, we hold that appellants' prima facie case has been rebutted. Therefore, the district judge did not err by denying appellants' constitutional challenge to the jury selection process.

### B

Appellants also have attacked the process on statutory grounds. They contend

that the jury commissioners unlawfully delegated their duties by contracting with a computer service in Boise to prepare the master jury list, the "jury wheel" and the quarterly list. Appellants also invite attention to I.C. § 2–208, which requires the jury commission to send a juror qualification form to each person whose name appears in the "jury wheel" and, if a person fails to return a completed form, he or she must be "directed by the jury commission to appear forthwith before the clerk to fill out the juror qualification form."

 As explained more fully below, each of the appellants' contentions of statutory error raises a question concerning the manner in which such issues must be raised and preserved on appeal. However, we deem it appropriate to note that the contention regarding unlawful delegation of jury commission functions is facially without merit. We are not persuaded that Idaho's Uniform Jury Service and Selection Act precludes jury commissioners from delegating such ministerial duties as may be performed by a computer service. The use of computers has been recognized as beneficial to the goal of fair and impartial jury selection. *See Pitman v. State,* 436 N.E.2d 74 (Ind.1982). Moreover, appellants have made no showing that use of the computer service in this case in any way adversely affected the random nature or objectivity of the jury selection process. Absent such a showing, no purported error by the jury commissioners would afford a basis to disturb the judgments of conviction. *See State v. Silcox,* 103 Idaho 483, 650 P.2d 625 (1982).

A potentially more troubling problem is presented by the jury commissioners' disregard of the statutory directive to follow up prospective jurors who fail to return completed juror qualification forms. Under the Uniform Act this duty is mandatory. It is not merely permissive, as it is in numerous other jurisdictions or in the federal system. *See* 28 U.S.C. § 1864.

 It is undisputed that Elmore County, at times pertinent to this case, made no follow-up contacts and that persons who

failed to return completed questionnaires were not placed on the quarterly jury list. This procedure arguably injected an element of voluntarism into jury service. To the extent that a jury selection system relies upon volunteers, it cannot be truly random and objective. *See United States v. Kennedy,* 548 F.2d 608 (5th Cir.1977), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977); *cf. United States v. Gometz,* 730 F.2d 475 (7th Cir.1984) (holding that voluntarism is not entirely precluded in the federal system).

Appellants have undertaken no showing that the commissioners' failure to contact nonresponding potential jurors contributed to underrepresentation of Hispanics. Indeed, as noted previously, there was no material attrition of Hispanic representation at those stages of the jury selection process in which the "jury wheel" was constructed from the master jury list or in which the quarterly jury list was drawn from the "jury wheel." The inescapable inference is that an Hispanic person whose name appeared on the master jury list was as likely as the average person to return a completed juror qualification form.

 Nevertheless, while a constitutional challenge to the jury selection process must focus upon systematic underrepresentation of an identifiable group like Hispanics, no such requirement applies to a statutory challenge. A challenge under the Uniform Act may be based broadly upon a showing that the statutory violation has substantially affected the random nature and objectivity of the process. *E.g., Wireman v. State,* 418 N.E.2d 1182 (Ind. App.1981), *cert. denied,* 459 U.S. 992, 103 S.Ct. 350, 74 L.Ed.2d 389 (1982) (applying Uniform Act as adopted in Indiana).

The Uniform Act does not prescribe a specific remedy for an irregularity in selecting the jury, but it authorizes a court to "stay the proceedings pending the selection of the jury in conformity with this Act, quash an indictment, or grant other appropriate relief." Whether violation of the follow-up requirement would be grounds

for vacating a judgment of conviction is a question that would face us squarely here if this irregularity had been challenged properly below.

 Idaho Code § 2–213(2), a part of the Uniform Act, provides that an irregularity in selecting the jury may be challenged only by a motion "containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with this act...." This statutory requirement has its counterpart in 28 U.S.C. § 1867(d), a part of the federal act. In *United States v. Kennedy, supra,* the court held that "the procedures prescribed in § 1867 are the exclusive means by which a defendant may challenge a jury on the basis of noncompliance with the [federal] Act." 548 F.2d at 613. *Accord, e.g., United States v. Young,* 570 F.2d 152 (6th Cir. 1978); *United States v. Foxworth,* 599 F.2d 1 (1st Cir.1979); *Government of the Virgin Islands v. Rosado,* 699 F.2d 121 (3rd Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 113, 78 L.Ed.2d 114 (1983).

In this case appellants' challenge to the jury selection process was made by two unverified motions, one alleging an infringement of constitutional rights and the other alleging the improper delegation of functions to the computer service. Neither motion contained, or was accompanied by, any "sworn statement of facts." This omission, unless satisfactorily explained, is fatal to a statutory challenge to the jury. The Uniform Act's remedial procedures afford the sole means for enforcing the Act's substantive provisions. *See generally* V. McKusick & D. Boxer, *Uniform Jury Selection and Service Act,* 8 HARV. J. ON LEGIS. 280, 290 (1971). As noted in *Kennedy,* this rigid procedure "may seem harsh in the individual case[,]" but the federal act, like the Uniform Act, allows a jury to be challenged for lack of random selection, rather than upon the more rigorous constitutional test of systematic underrepresentation, and "[a]s a price for this remedy, Congress was entitled to exact strict compliance with formal procedural rules." 548 F.2d at 613.

Here, not only did appellants' motions omit a sworn statement of facts, but they also failed to specify the follow-up violation as one of the alleged irregularities. Under these circumstances, we are constrained to deny appellants' challenge. *See State v. Pontier,* 95 Idaho 707, 711, 518 P.2d 969, 973 (1974) (listing lack of sworn statement among several reasons for rejecting challenge to alleged irregularity in jury selection). We must leave for another day and another case the question whether a violation of the follow-up requirement would require a judgment of conviction to be set aside.

## II

We next consider whether evidence seized from appellants' automobile should have been suppressed. This issue embraces two inquiries: whether an initial search impermissibly was conducted without a warrant and whether a second search, conducted with a warrant, was tainted by an allegedly false statement in the police affidavit used to obtain the warrant. Both searches resulted in seizure of property allegedly stolen during the burglary. The validity of each search has been challenged under the fourth amendment to the United States Constitution.

The burglary occurred at night on the Sky Ranch in Elmore County. It was discovered by a ranch employee who later testified that an individual identified as Julian Lopez visited the employee's trailer that night. After a short conversation, Lopez left the trailer but the employee became suspicious when he did not see vehicle lights leaving the premises. Upon investigating he saw a light shining in the ranch workshop. He also observed a large car and the forms of men walking between the shop and the car. The employee telephoned his foreman who, in turn, notified a state police officer. The foreman and the state trooper drove to the ranch and, while enroute, encountered the appellants' vehicle traveling the opposite direction. The trooper stopped the vehicle, warned the appellants that they had a faulty headlight,

and asked where they had been. Two of the appellants said that they were coming from a different ranch, where they had spent the evening. The vehicle was allowed to proceed.

Arriving at the Sky Ranch, the trooper obtained descriptions of the vehicle and of the individual whom the employee had seen. They were similar to the vehicle stopped and to one of its passengers. A telephone call revealed that the owner of the other ranch had not seen anyone come to his place that evening. Tire tracks, of a type which appellant's vehicle could have produced, were observed.

Armed with this information, the trooper issued an all points bulletin for the vehicle. It was stopped on a highway by an Elmore County Sheriff's Deputy. With permission from the occupants, the deputy looked in the trunk but saw nothing at the time which appeared to be evidence of a burglary. The state trooper and ranch foreman then arrived on the scene. After the appellants had been placed in police cars, the deputy peered into their vehicle with the aid of a flashlight. On the floor near the rear seat he observed a socket which the foreman identified as property of the Sky Ranch. The vehicle was impounded and later searched again, this time with a warrant. The search revealed additional evidence in the trunk.

We first turn to seizure of the socket on the floorboard of the car. The state contends that the seizure is not subject to fourth amendment review because it did not result from a search. Rather, the socket was exposed to "plain view." In the alternative, the state argues that even if a search did occur, it was valid under an "automobile exception" to the fourth amendment's warrant requirement. The evidence is not clear, and the record contains no finding below, on whether the socket was readily identifiable as evidence before it was removed from the floorboard. Consequently, we have elected not to address the state's argument of "plain view." Instead, we will assume, for the sake of

discussion, that there was a warrantless search.

In *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court created a broad exception to the constitutional proscription against warrantless searches. The "*Carroll* doctrine," as it has evolved during the past six decades, is invoked by a showing of probable cause to believe that a search will yield evidence of a crime and of an exigent circumstance making it impracticable to obtain a search warrant. In most situations, the automobile itself, particularly one travelling on a highway, provides a *Carroll* exigency. *See Colorado v. Bannister,* 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980); *Chambers v. Maroney,* 399 U.S. 42, 40 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *State v. Bottelson,* 102 Idaho 90, 625 P.2d 1093 (1981); *State v. Fowler,* 101 Idaho 546, 617 P.2d 850 (1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981); *but cf. Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (no exigency if police planned in advance to seize the automobile and did so while it was parked in a driveway).

In the present case it is clear that the appellants' automobile, stopped on the highway at night, represented a bona fide exigency. The question is narrowed to one of probable cause. We believe this requirement, too, was satisfied. As noted, the state trooper had encountered the appellants face to face before the search. They had been travelling away from the scene of the crime. They had furnished dubious information about their prior activities. One of them resembled a man generally described by the ranch employee, and their automobile also resembled the vehicle earlier described. The tires were consistent with tracks previously observed. We believe these facts, taken together, furnished probable cause to believe that appellants' vehicle was connected with the burglary and contained evidence of the crime. The requisites of the "*Carroll* doctrine" were satisfied. The initial, warrantless

search of the vehicle did not violate the fourth amendment.

As noted, the second search was conducted under warrant while the car was impounded. Appellants contend that the warrant was issued in reliance upon an allegedly false statement, set forth in a police officer's affidavit, that the socket earlier seized had been immediately recognizable as stolen property. However, this affidavit was not admitted in evidence by the district court and it has not been made a part of the record on appeal. Consequently, we are unable to review the allegedly false statement or to determine its materiality in relation to the entire affidavit. We will not presume error from a silent record. *State v. Bylama*, 103 Idaho 472, 649 P.2d 1228 (Ct.App.1982). In any event, the existence of probable cause for the initial, warrantless search also would have supported a subsequent search of the car when impounded. *E.g., United States v. Ross*, 456 U.S. 798, 807 n. 9, 102 S.Ct. 2157, 2163 n. 9, 72 L.Ed.2d 572 (1982); *Texas v. White*, 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1975). We find no error in admitting evidence obtained during the second search.

### III

Appellants further contend that the district court erred in allowing testimony by two prosecution witnesses whose identities had not been disclosed until the morning of the day when they were called. A prosecutor is constitutionally required to disclose exculpatory evidence. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). He also is required by rule to disclose, upon request, the names and addresses of persons having knowledge of the relevant facts. I.C.R. 16(b)(6). However, there are limits. The prosecutor's duty to disclose witnesses does not extend to persons called for rebuttal. *State v. Pierce*, 107 Idaho 96, 685 P.2d 837 (Ct.App.1984). The Idaho Supreme Court also has said that failure to disclose a witness for the state's case in chief does not create reversible error if his testimony

"only concern[s] the chain of possession of certain evidence." *State v. Goodrick*, 95 Idaho 773, 777, 519 P.2d 958, 962 (1974).

In this case, the witnesses were called to testify about the evidence found in the trunk of the car after impoundment. This evidence previously had been offered but defense counsel temporarily had blocked its admission, arguing that the evidence may have been planted. The prosecutor elected to meet this challenge by establishing the vehicle's chain of custody after the appellants were arrested, and by showing that no one, to the witnesses' knowledge, had put evidence in the trunk. Showing a chain of custody is a permissible method of proving the authenticity of real evidence; but it is not, of itself, a separate requisite for admissibility. *State v. Campbell*, 104 Idaho 705, 662 P.2d 1149 (Ct.App. 1983).

In our view, the prosecutor was not required to anticipate the appellants' objection to real evidence, and to list contingent foundational witnesses, in response to general pretrial discovery. Of course, we do not hold—nor do we read *Goodrick* broadly to hold—that failure to disclose foundational witnesses never can result in reversible error. There might be occasions when a prosecutor knows, or should know, that timely disclosure of such witnesses is indispensable to provide the defendant an irretrievable opportunity to determine the authenticity of otherwise suspect evidence. However, such circumstances are not apparent here. The evidence was not inherently suspect. Rather, the question was whether the police were telling the truth about where they got it. There has been no contention that tardy disclosure inhibited a defense challenge to the witnesses' knowledge or credibility. The defense merely requested a five minute recess to interview one of the witnesses before he testified. Considering all these facts, we hold that the trial judge did not err by allowing the testimony.

## IV

The final issue is whether the trial judge should have dismissed the burglary charges as a sanction for alleged prosecutorial interference with trial preparation by the defense. It is undisputed that the prosecutor, as part of his general policy, instructed police witnesses not to discuss the case with defense counsel unless the prosecutor was present or had consented to interviews in his absence. Appellants contend that the prosecutor's policy unduly burdened their right to effective assistance of counsel under the sixth amendment.

There is no indication that the services of defense counsel actually were ineffective. The appellate record amply demonstrates the contrary. Neither does it appear that defense preparation was materially impeded by lack of access to any police witness. At the preliminary hearing, two officers testified and were subjected to cross-examination. A third actually discussed the case with defense counsel outside the prosecutor's presence. All defense discovery requests were answered. Defense counsel sought from the district court no specific relief from any particular obstruction of access to, or exertion of undue prosecutorial influence upon, a witness. Rather, defense counsel simply sought dismissal upon a generalized expression of dissatisfaction with the prosecutor's policy. Upon this limited record, although we do not endorse the prosecutor's policy, we conclude that the district court did not err by refusing to dismiss the charges.

The judgments of conviction are affirmed.

WALTERS, C.J., and SWANSTROM, J., concur.