798 P.2d 1

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Federico PAZ, Defendant–Appellant.**

**No. 17452.**

Supreme Court of Idaho.

June 13, 1990.

Dissent On Denial of Rehearing
Sept. 25, 1990.

Van Bishop, Nampa, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen. (argued), Boise, for plaintiff-respondent.

McDEVITT, Justice.

## FACTUAL BACKGROUND

On August 29, 1987, Federico Paz encountered Gerry Bright (the victim) and two of his companions, Randall Gould and Larry Page, in a restaurant.

Events led to a verbal exchange between Bright and Paz. Bright then continued eating at a table in the restaurant with his companions.

After finishing his breakfast, Paz left the restaurant, secured a semi-automatic weapon from his friend's motor vehicle, sent his friend away so he would not be implicated, and some minutes later returned to the restaurant. Paz approached the table where Bright, Gould and Page were seated, concealing the weapon as he approached.

At close range, Paz opened fire with the weapon, killing Bright and seriously wounding Gould and Page. After emptying the weapon, Paz attempted to flee, but was stopped and disarmed by the wounded Gould.

Paz was taken into custody and subsequently charged with first degree murder.

## PROCEDURAL BACKGROUND

The appellant, Federico Paz, was charged by information with murder in the first degree arising out of this incident.

After preliminary proceedings, Paz's trial was scheduled for February 1, 1988. On January 20, 1988, appellant filed a motion to quash the Jury Pool and Panel on the ground of systematic underrepresentation of Hispanics. The Motion to Quash alleged that the appellant was of Hispanic descent; Hispanics are recognized as a cognizable group in the community; the initial Jury Pool and Panel selected for the pending trial of appellant did not represent a fair cross-section of the population of Canyon County, Idaho; such unfair and disproportionate representation resulted from the systematic exclusion of an undue percentage of Hispanics, causing Hispanic representation in the Jury Pool and Panel disproportionately lower than that of the percentage of Hispanics in the community; this disproportionate representation was caused by the utilization by the Canyon County Jury Commission of driver's license lists and voter registration lists; the application of I.C. § 2–209(2)(a) and (b) resulted in an impermissible and unconstitutional standard and caused the systematic exclusion of Hispanics as qualified jurors; and that the procedures employed by the Canyon County Jury Commission for method of selection further resulted in the systematic exclusion of Hispanics.

The trial court ruled that the Motion to Quash was not timely filed, that appellant had not complied with the procedures to challenge jury selection set forth in I.C. § 2–213, and that appellant had no statutory basis to pursue the Motion to Quash. The court did proceed to permit evidence to be presented on the constitutional issues raised by appellant in the Motion to Quash.

Appellant produced evidence through an assistant jury commissioner for Canyon County and an associate of counsel for appellant, who had reviewed the records of the Jury Commission and the names of potential jurors, disqualified jurors, and "not found" jurors appearing on those lists in that office for the years 1986, 1987, and 1988. Following conviction Paz requested the court that the jury pass sentence, which motion was denied.

The trial court held a sentencing hearing pursuant to I.C. § 19–2515 for the imposition of a sentence and the presentation of evidence in connection with the sentencing process.

At that hearing the presentence investigation was reviewed by the court. It contained a statement of the father of the victim Bright, concerning the victim and his family immediately prior to his demise, and

a statement of Randall Gould concerning his opinion of the disposition that should be made by the court of the appellant. The court caused a presentence report to be prepared, and the trial court conducted sentencing hearings. Included as part of the presentence investigation were police reports and a presentence investigation from an Oregon case in which the appellant Paz had been charged with murder, as well as police reports and a probation report involving a juvenile charge brought against Paz some years earlier.

The court also had available to it a presentence investigation and a post-sentence report, as well as a psychiatric report prepared while Paz was serving time in 1982. The presentence investigation also contained a statement from Paz's victim's father. In addition, the presentence report contained a statement from one of the individuals wounded by Paz in the shooting at the restaurant.

Following the sentencing hearing, the trial court made findings concerning aggravation and mitigation pursuant to I.C. § 19–2515(g) and sentenced Federico Paz to death. The trial court weighed each aggravating circumstance against all the mitigating circumstances, which would overcome or outweigh the aggravating circumstance, and found:

> Each statutory aggravating circumstance which this court has found by itself, outweighs the mitigating circumstances. The supporting factor of the statutory aggravating circumstances found by this court clearly demonstrate that this defendant is easily provoked, that he irrationally reacts to that provocation, that he justifies his irrational behavior and does not understand why society is shocked by his conduct.

> The defendant has not been rehabilitated or deterred by past efforts of society. Society has not been protected from this defendant. It is obvious to this court that there is a substantial risk and likelihood that this defendant would kill again. This court does not find that the mitigating circumstances presented outweigh the gravity of any aggravating

circumstance found, nor do such mitigating circumstances make the imposition of death unjust.

This Court has before it the mandatory review of the death sentence imposed on Federico Paz, together with appeals from his conviction and from the denials of post-conviction relief by the court.

## ISSUES RAISED ON APPEAL

Appellant raises the following issues on appeal:

1. The trial court erred in denying the appellant's Motion to Quash the Jury Pool and Panel.

 (a) The trial court erred in ruling that appellant had not established a prima facie case of underrepresentation.

 (b) The trial court erred in not requiring the State to offer responsive evidence to that of Paz at the hearing on his Motion to Quash the Jury Pool and Panel.

2. Idaho Code § 19–2515 is violative of the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States, by not requiring sentencing in a capital case by a jury of appellant's peers.

3. Idaho Code § 19–2515(g) is so vague in its terms that it violates the Eighth and Fourteenth Amendments of the United States Constitution.

4. The trial court erred in relying upon inadmissible hearsay *i.e.,* the presentence investigation report and the statements of Bright's father and Gould, and statements concerning Paz's conviction in Oregon as a grounds for finding aggravating circumstances.

5. The findings of the trial court were not sufficient to support the finding of "utter disregard for human life" as an aggravating circumstance beyond a reasonable doubt.

6. The trial court erred by allowing a victim impact statement at the sentencing hearing.

7. The trial court erred in admitting and relying upon statements made in a prior criminal investigation which had oc-

curred in Oregon which statements had been ruled inadmissible in a prior Oregon court proceeding. ·

8. The appellate review provision of I.C. § 19–2719 limiting time of capital convicts to proceed thereunder, are violative of article I, § 18 of the Idaho Constitution and the Sixth and Fourteenth Amendments of the United States Constitution.

## I.

### MOTION TO QUASH THE JURY POOL

Paz timely moved to quash the Jury Pool and Panel on the following grounds:

1. Paz is of Hispanic descent.

2. Hispanics are recognized as a cognizable group.

3. Hispanics. were underrepresented in the Jury Pool and Panel selected for use in this trial.

4. The Canyon County Jury Commission's utilization of only two jury source lists, *i.e.* driver's license lists and voter registration lists, systematically excluded the Hispanic population from consideration as jurors.

5. Idaho Code § 2–209(2)(a) and (b), establishing prospective juror qualifications and the manner of selecting a juror panel, unconstitutionally excludes Hispanics from becoming qualified jurors.

6. The methodology employed by the Canyon County Jury Commission in dealing with jurors who are "non-found" as a result of improper addresses and the return of jury qualification forms undelivered to the Commission, together with the absence of any provision in the Idaho Code as to a procedure to be used in such a situation, also results in the systematic exclusion of the Hispanic population in Canyon County, Idaho, from consideration as jurors.

At the time established for hearing this motion, the trial court ruled that Paz's statutory challenge was untimely in that it was not filed within seven (7) days of discovery of the basis for the motion and failed to comply with I.C. § 2–213, but that it would consider the constitutional issues raised by the motion. The motion filed on behalf of Paz did not raise statutory issues other than those included in the constitutional issues and therefore does not create a separate legal issue on appeal.

■ The result of jury underrepresentation is to encroach upon the accused's right to an impartial jury in criminal prosecutions, which is guaranteed to the accused as part of the due process protection afforded by the Sixth Amendment of the United States Constitution, made applicable to the several states through the due process clause of the Fourteenth Amendment, and article 1, §§ 7 and 13 of the Idaho Constitution.

At the hearing on his motion to quash, Paz introduced evidence through: Hector DeLong, the then Director of the Idaho Migrant Council, who testified that Hispanics are a severable, identifiable group; Carolyn Coon, the Assistant Jury Commissioner for Canyon County, who testified as to the process and methodology by which a Jury Pool and Panel is selected in Canyon County from driver's license lists and voter registration lists and to the procedure used by the Canyon County Jury Commission in dealing with "non-found" prospective jurors; Deborah Orr, an Assistant Canyon County Public Defender who had reviewed the driver's license lists and voter registration lists for the years 1985, 1986 and 1987, to determine the number of Hispanics represented on those lists by identifying Hispanic surnames; and Steve Clark, a statistician who testified as to the statistical underrepresentation of Hispanics in the jury pools in Canyon County.

The State cross-examined each of these witnesses produced by Paz. The State offered no affirmative evidence, relying on its assertion that Paz had failed to establish a prima facie case.

In ruling on the motion to quash, the trial court relied for guidance upon *State v. Lopez,* 107 Idaho 726, 692 P.2d 370 (Ct. App.1984).

■ Judge Burnett's analysis in *State v. Lopez,* of the issues raised in a constitutional challenge to the method of selecting the jury pool where selection results in underrepresentation of a distinctive group in the population due to systematic exclusion, is scholarly, thoughtful, and need not be repeated here.

*Lopez* set forth the appropriate standards and guidelines as those are outlined in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); and *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

In *Duren v. Missouri,* the United States Supreme Court succinctly stated that:

In order to establish a prima facie violation of the fair cross-section requirement the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

439 U.S. at 364, 99 S.Ct. at 668.

The Court went on to hold that upon establishing this threshold showing of a prima facie case, the burden shifts to the government to show that the disparity is justified by a significant state interest. 439 U.S. at 367–68, 99 S.Ct. at 670.

The Court of Appeals in *State v. Lopez* applied the appropriate standard of review of an appellate court by adopting the standard set forth in *Castaneda v. Partida,* 430 U.S. at 482, 97 S.Ct. at 1274, which holds, by implication, that although the district judge is the trier of fact, the appellate court must independently decide whether the facts on the record show a violation of the fundamental constitutional rights at issue.

Although we approve the analysis of the methodology for evaluating jury representativeness as set forth in *State v. Lopez* and the court's review of the absolute disparity standard, the comparative disparity standard and the statistical significance test, we caution that the numerical examples used by the court in *State v. Lopez* and the reference by it to percentages appearing in other reported decisions are not absolute, these issues are not susceptible of being resolved by formula, and this Court does adopt the well advised statement of the Supreme Court in the State of California in *People v. Harris,* 36 Cal.3d 36, 201 Cal. Rptr. 782, 679 P.2d 433, *cert. denied,* 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984):

We do not at this time adopt one method of measurement to the exclusion of the others. Rather, it will be helpful when possible in any particular case, to compare the results under the various techniques in deciding whether a particular disparity suggests a constitutional violation.

36 Cal.3d at 47, 201 Cal.Rptr. 787 n. 2, 679 P.2d at 438 n. 2.

## A. DISTINCTIVE GROUP IN THE COMMUNITY

■ The evidence in this case clearly establishes that Paz is of Hispanic descent. Hispanic people represent a distinctive group in the population, *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); and the use of Hispanic surnames to identify this group is an acceptable practice for the purposes of establishing a prima facie case. *Montoya v. People,* 141 Colo. 9, 345 P.2d 1062 (1959); *State v. Lopez,* 107 Idaho at 730, 692 P.2d 370. Paz did establish the first criteria required under the *Duren v. Missouri* test.

## B. FAIR AND REASONABLE REPRESENTATION OF THE COMMUNITY

■ The next criteria of the *Duren* test is whether representation of Hispanics in the jury pool was "fair and reasonable in relation to the number of such persons in the community." *Duren v. Missouri,* 439 U.S. at 364, 99 S.Ct. at 668.

The absolute disparity evidence introduced by Paz, at the hearing on his motion to quash, showed that of a total population of 91,402 people in Canyon County, 8,878

were Hispanics. Thus, Hispanics made up approximately 9.7% of that county's population. In the years 1986, 1987 and 1988, there were 4,000 potential jurors, in each such year, comprising the jury pool. However, in 1986, 6.8% of the jury pool were Hispanic; in 1987, 6.4% of that pool were Hispanic; and in 1988, 7.4% of the jury pool were Hispanic, based upon the methodology of identifying Hispanic surnames adopted by counsel for Paz.

■ Gross population figures may be used for comparison with the jury pool, by the defendant, to establish a prima facie case. *People v. Harris,* 36 Cal.3d at 36, 201 Cal.Rptr. 782, 679 P.2d 433; *Duren v. Missouri,* 439 U.S. at 365–66, 99 S.Ct. at 668–70. Based upon the foregoing, the absolute disparity between the number of Hispanics identified as residents of Canyon County and the percentage of Hispanic surnames in the jury pool was 2.9% for 1986, 3.3% for 1987, and 2.3% for 1988.

Testimony was introduced as to the comparative disparity method, which utilizes the numerical difference between the percentage of Hispanics in the jury pool and the percentage of Hispanics resident in Canyon County. The numerical difference is then divided by the percentage of Hispanics resident in Canyon County and multiplied by one hundred. This yields a percentage which reflects the diminished likelihood that a particular Hispanic would be selected for jury duty as compared to the general population of Canyon County.

The comparative disparity percentage for 1986 was 30%; for 1987, 34%; and for 1988, 23.7%. No evidence or testimony was introduced concerning the substantial impact test or the statistical significance test.

Paz argues that the disparity would be even more significant if the Court were to look to the "final jury wheel" as opposed to the initial jury pool of 4,000 names. Paz's expert testified that the disparity between

the gross Hispanic population, based upon the 1980 census in Canyon County, in the years 1986, 1987 and 1988, and the numbers on the "final jury wheel" were 57% in 1986, 66% in 1987, and 49.5% in 1988. There is no testimony, however, that this final disparity, identified by Paz's counsel as the "final jury wheel" disparity, is a result of anything other than disqualification of the prospective jurors in the jury pool by the operation of I.C. § 2–209(2)(a) and (b), as administered by the Jury Commissioners Office in Canyon County.[1]

Paz introduced testimony by Deborah Orr, an associate in the office of defense counsel, who found that the 1,803 names on the "disqualified list" (which consisted of individuals out of the initial jury pool of 4,000) were not called for reasons that they were (a) not United States citizens; (b) not able to read, speak and understand the English language; or (c) not found after summons had been mailed to them and were unable to be located by the bailiffs of Canyon County. Orr testified that for 1986, there were 21 people with Hispanic surnames out of 41 that were disqualified for not being United States citizens; 30 Hispanic surnames out of a total of 52 were disqualified for being unable to read, speak and understand the English language; and 70 Hispanic surnames, out of a total of 531, were "non-found."

For 1987, 23 Hispanic surnames out of a total of 38 individuals were disqualified for not being United States citizens; 30 Hispanic surnames out of 45 individuals were disqualified for not being able to read, speak and understand English, and 81 Hispanic surnames out of 814 individuals were disqualified for being "non-found."

For 1988, 28 Hispanic surnames out of 44 persons were disqualified for lack of United States citizenship; 21 Hispanic surnames out of 33 persons total were disqual-

---

1. **2–209. Court determination of qualification of prospective juror—Qualifications—Physician's certificate of physical or mental disability.**

 \* \* \* \* \* \*

(2) A prospective juror is disqualified to serve on a jury if he:

(a) is not a citizen of the United States, eighteen (18) years old, and a resident of the county;

(b) is unable to read, speak, and understand the English language;

 \* \* \* \* \* \*

ified for not being able to read, speak and understand English, and 93 Hispanic surnames out of 792 names were listed as "non-found."

This evidence clearly indicates a much higher disqualification rate for people with Hispanic surnames on the basis that they are not United States citizens or that they do not read, speak and understand the English language, than the representation of Hispanic surnames in the general population of Canyon County.

Paz, through the evidence adduced, did set forth significant statistical underrepresentation as to the second prong of the *Duren v. Missouri* test.

## C. SYSTEMATIC EXCLUSION

Long before the now applicable test provided by *Duren v. Missouri*, this Court clearly held that systematic exclusion of any class or race of people because of their race or color, constitutes a denial of the "'equal protection of the laws' to anyone falling within that class, ..." (Emphasis in original omitted.) *State v. Walters*, 61 Idaho 341, 347, 102 P.2d 284, 286 (1940); *State v. McConville*, 82 Idaho 47, 349 P.2d 114 (1960).

As a final prong required to make a prima facie showing that the defendant is being denied a jury of peers who comprise a "fair and reasonable representation of the community," the defendant must show that this underrepresentation, or a lack of a fair cross-section being represented, is due to "systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. at 364, 99 S.Ct. at 668.

Systematic exclusion has been held to mean that the disparity complained of is "inherent in the particular jury selection process utilized." *Duren v. Missouri*, 439 U.S. at 366, 99 S.Ct. at 669.

■ Paz's counsel raised the following issues concerning the claim that the jury selection process in Canyon County resulted in "systematic exclusion" of Hispanics from the jury pool:

1. The utilization by the Canyon County Jury Commission of only two jury source lists, drivers license and voter registration, systematically excludes the Hispanic population of Canyon County, Idaho, from consideration as jurors.

2. Idaho Code § 2–209(2)(a) and (b) in and of itself systematically excludes Hispanics from becoming qualified jurors.

3. The Canyon County Jury Commission's lack of follow up on jury qualification forms returned to the commission because of a wrong address, and the Idaho Code's silence as to procedure on the follow up of these forms results in a systematic exclusion of the Hispanic population of Canyon County, Idaho, from consideration as jurors.

The utilization by the Canyon County Jury Commission of driver's licenses and voter registration lists is appropriate. The use of voter registration lists is mandated by I.C. § 2–206. Driver's license lists are a supplemental list designated by this Court pursuant to I.C. § 2–206(1), as lists to be utilized to supplement voter registration list. The state is free to designate the source of jury lists, "so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty." *Brown v. Allen*, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953), *overruled on other grounds, Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Voter registration lists and driver's license lists are appropriate sources from which to select jurors.

■ The evidence adduced by Paz to support the contention that the utilization of those lists results in underrepresentation is tied into his second attack on the procedures utilized by Canyon County in jury selection, which is that the application of I.C. § 2–209(2)(a) and (b), in and of itself, systematically excludes Hispanics. That statute limits those eligible to serve on a jury to United States citizens who are able to read, speak, and understand the English language.

Exclusion of Hispanics may result from the application of these statutes, simply because the current population of non-citizens and non-English speaking persons in Idaho is largely Hispanic. Even finding that this demographic phenomenon results in the exclusion of Hispanics as an inherent part of the jury selection system and that Paz has made a prima facie case under this prong of the *Duren* test, we hold that the jury selection process causing the disparity is supported by a significant state interest.

The State ran a very substantial risk in relying solely on its claim that Paz failed to establish a prima facie case. This strategy risked the cost and expense of the trial, where it might be subsequently determined that a prima facie case had been established. Such a determination would shift the burden to the State to rebut the prima facie case.

█ The burden of proof is shifted upon a prima facie showing of a violation of the right to a jury selected from a representative cross-section of the community because such an event is prejudicial per se. "The right to a fair and impartial jury is one of the most sacred and important of the guarantees of the Constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside." *People v. Wheeler*, 22 Cal.3d 258, 283, 148 Cal.Rptr. 890, 908, 583 P.2d 748, 766 (1978), quoting *People v. Riggins*, 159 Cal. 113, 120, 112 P. 862, 865 (1910).

The State might well meet its burden of proof by producing data which defines persons presumptively eligible for jury service, in order to show that there was not a disparity of constitutional significance, or that a certain level of disparity is unavoidable, even utilizing multiple sources and other practical means. If this is not demonstrable, the State may defend the underrepresentation by showing that the disparate treatment of potential jurors is justified. If the application of I.C. § 2–209 results in systematic underrepresentation of Hispanics as jurors, the jury selection system may still be upheld if the State

shows that "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process, ... that result in the disproportionate exclusion of a distinctive group." *Duren v. Missouri*, 439 U.S. at 368, 99 S.Ct. at 671. (Footnote omitted.) Although the State relied primarily on its assertion that Paz had not made a prima facie showing at trial, it has also argued on appeal that a jury selection process which excludes non-citizens and non-English speaking persons is justified by such a state interest.

█ In general, the rule is that arguments not asserted below will not be considered on appeal. *Masters v. State*, 105 Idaho 197, 668 P.2d 73 (1983). However, as another court aptly stated, "[a]ppellate review does not consist of supine submission to erroneous legal concepts even though none of the parties declaimed the applicable law below." *Empire Life Ins. Co. v. Valdak Corp.*, 468 F.2d 330, 334 (5th Cir.1972). "It is well established that as a matter of discretion, an appellate court may pass upon issues not pressed before it or raised below when the ends of justice will be best served by doing so." *Id.* (citations omitted). An appellate court should not be confined to the theories advanced by the parties. A case should be governed by the applicable law, even though the parties are unable or unwilling to argue it. *Maynard Invest. Co. v. McCann*, 77 Wash.2d 616, 465 P.2d 657 (1970).

Appellate consideration of an issue raised for the first time on appeal is appropriate, in the appellate court's discretion, where the new issue is purely one of law, and refusal to consider it would result in a miscarriage of justice. *Evans v. Triple R Welding & Oil Field Maintenance Corp.*, 472 F.2d 713 (5th Cir.1973); *UFITEC, S.A. v. Carter*, 20 Cal.3d 238, 142 Cal.Rptr. 279, 571 P.2d 990 (1977); *State v. Hickmann*, 273 Or. 358, 540 P.2d 1406 (1975); *Earl M. Jorgenson Co. v. Mark Constr., Inc.*, 56 Haw. 466, 540 P.2d 978 (1975). It is not appropriate where additional facts would have been developed in the trial court if the theory had been presented there.

*Higginbotham v. Ford Motor Co.,* 540 F.2d 762, 768 n. 10 (5th Cir.1976); *Bogacki v. Board of Supervisors,* 5 Cal.3d 771, 97 Cal.Rptr. 657, 489 P.2d 537 (1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1301, 31 L.Ed.2d 488 (1972).

In this case, there is no need to look for factual evidence in the record to evaluate the State's argument on the issue of whether the jury selection system is supported by a significant state interest. The issue is purely a question of law, and the State's failure to produce any evidence on this point at trial is not fatal to its argument. We consider that it would be a manifest miscarriage of justice if the state jury selection system was overturned due to the reliance by the State upon Paz's failure to make out a prima facie case of underrepresentation. Pursuant to our duty to apply the correct law to the facts of the case, we note that the United States Supreme Court has upheld the use of certain criteria in the jury selection process.

The Supreme Court has approved state limitation of jurors to United States citizens. *Perkins v. Smith,* 370 F.Supp. 134 (D.C.Md.1974), *aff'd,* 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976). The jury system is fundamental to our system of justice, and individual juries are in a position to make essentially unreviewable decisions affecting the administration of this country's laws. The State has "a substantial interest in ensuring that the power exercised by ... jurors is entrusted to persons who can be expected to have a substantial commitment to the just enforcement of the law in accordance with the mores and fabric of American life." *Perkins,* 370 F.Supp. at 140–41 (Winters, J., concurring.)

■ As to the language requirement, the Supreme Court has held that, "[s]tates should decide for themselves the quality of their juries as best fits their situation so long as the classifications have relation to the efficiency of jurors and are equally administered." *Brown v. Allen,* 344 U.S. at 473, 73 S.Ct. at 416. It would be patently unreasonable for this Court to require the state of Idaho to utilize jurors who are not proficient in the English language, un-able to understand testimony, directions of the court, or read exhibits and instructions. It is not difficult to perceive that the State has a significant interest in the integrity of the jury system, and that that interest is manifestly and primarily advanced by limiting jurors to those who are capable of understanding the proceedings. As long as the qualification is equally administered as to all foreign language speakers there is no constitutional infirmity in the requirement that jurors be competent in English.

■ As to the third point, the alleged lack of follow up on forms returned to the Jury Commission, we note that testimony introduced by Paz through Carolyn Coon, the Assistant Jury Commissioner for Canyon County, establishes that those procedures set out in the Uniform Jury Selection and Service Act were followed in Canyon County. This included the selection of potential jurors from the voter registration list and the driver's license list; the follow-up on mailing addresses returned "non-found" or improper; the issuance of subpoenas to those persons who did not respond, pursuant to I.C. § 2–208; and the exercise of all reasonable efforts to determine inconsistencies or discrepancies in addresses from the lists utilized.

In sum, we hold that the state is entitled to use voter registration and driver's license lists as a means of selecting jurors, and that the state may establish minimum qualifications for jurors where the qualifications relate to the juror's competence to understand and administer the law. We also hold that the statutory procedures for following up on returned jury qualification forms does not improperly exclude Hispanics from juries.

## II.

### RIGHT TO BE SENTENCED BY JURY

■ Paz's assertion of error on the part of the trial court by denying his motion for sentencing by a jury is not well-founded.

This Court, through Johnson, J., last dealt with the contention that the imposition of the death penalty without partic-

ipation by a jury in the sentencing process violates the Sixth, Eighth and Fourteenth Amendment to the Constitution of the United States in the case of *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299, *cert. denied,* —— U.S. ——, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989). That opinion analyzed Idaho, United States Supreme Court, and other federal case law and rejected this contention.

This Court rejects this assertion of error based on its holding in *State v. Charboneau.*[2]

### III.

## VAGUENESS OF THE STATUTORY DEFINITION OF "AGGRAVATING CIRCUMSTANCES"

■ Paz urges this Court to reconsider its prior analysis of *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); and *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988), in relation to the alleged vagueness of I.C. § 19–2515(g). That statute sets forth the procedure for weighing aggravating and mitigating circumstances in capital cases.

This Court specifically dealt with the authorities cited by Paz in the *State of Idaho v. Charboneau,* 116 Idaho at 151–53, 774 P.2d at 321–23, and sees no reason to revisit that analysis.

■ Paz further relies upon the different definitions of "heinous, atrocious and cruel" issued by this Court in *State v. Charboneau* and *State v. Fain,* 116 Idaho 82, 774 P.2d 252, *cert. denied,* —— U.S. ——, 110 S.Ct. 277, 107 L.Ed.2d 258 (1989), as evidence of vagueness in the statute. To the extent that different words used in these two opinions could result in different interpretation, such disparity must be dealt with in this case.

*State v. Charboneau* relies upon the definition adopted by this Court in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981). In *State v. Osborn,* this Court adopted language of the Florida Supreme Court for the definition of "heinous, atrocious and cruel," the definition of "exceptional depravity" given by the Nebraska Supreme Court; and itself construed the "utter disregard for human life" provision of I.C. § 19–2515(g).

As noted in *State v. Charboneau,* the Florida Supreme Court language has stood constitutional muster before the United States Supreme Court in *Proffitt v. Florida,* 428 U.S. 242, 254–56, 96 S.Ct. 2960, 2967–68, 49 L.Ed.2d 913 (1976).

Similarly, the language of the Nebraska Supreme Court withstood attack in *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881, *cert. denied,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 *reh'g denied,* 434 U.S. 961, 98 S.Ct. 496, 54 L.Ed.2d 322 (1977). This Court upheld the definition of "utter disregard for human life" in *State v. Charboneau* and reaffirmed the language of *State v. Osborn.* We do likewise.

To the extent any of the definitions of I.C. § 19–2515(g) analyzed and adopted in *State v. Charboneau,* are inconsistent with those contained in *State v. Fain,* this Court does hereby reaffirm the definitions contained in *State v. Charboneau* and holds that I.C. § 19–2515(g) thus defined passes this constitutional challenge.

### IV.

## HEARSAY EVIDENCE AT THE SENTENCING HEARING

■ In asserting error on the part of the trial court in relying upon "inadmissible hearsay" at the sentencing hearing, counsel for Paz interprets this Court's decision in *State v. Charboneau* to hold that all "hearsay" is improper to be considered by the judge at a sentencing hearing.

This is not the teaching of *Charboneau.*

The offensive "hearsay" evidence in *Charboneau* came to the court in the form of a letter from the father of the victim, outside the channels of the presentence

---

**2.** The United States Supreme Court revisited this issue in May of 1989, and again upheld judge finding aggravating circumstances authorizing death penalty. *Hildwin v. Florida,* 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989).

investigation and the presentence report, and for this purpose was "hearsay" that could not be considered by the court.

The statement in *Charboneau* pertinent to this case is as follows:

The letter in question here was not part of a presentence report. Even if it had been, the hearsay could only have been included "where the presentence investigator believes that the information is reliable." I.C.R. 32(e)(1). Although the letter was offered and admitted at the time Mr. Arbaugh was testifying, permitting cross-examination of Mr. Arbaugh as to the statements made in the letter, this did not cure the hearsay nature of the statements. We construe I.C. § 19–2515(d) to permit the parties in a formal sentencing hearing to present all relevant evidence that would otherwise be admissible. Under [*State v.*] *Creech* [105 Idaho 362, 670 P.2d 463 (1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984)] the contents of presentence investigation reports are an exception to this requirement. The State would have us also except from the requirement for live testimony under I.C. § 19–2516 "all relevant evidence" as referred to in I.C. § 19–2515(d). This interpretation would make relevant hearsay admissible in a sentencing hearing, even though it was not included in a presentence investigation report.

We note that the Idaho Rules of Evidence, except those with respect to privileges, do not apply to sentencing proceedings. I.R.E. 101(e)(3). Therefore, there is no conflict between I.C. § 19–2515(d) and these rules that would render the statute of no force or effect under I.R.E. 1102. However, if we were to allow all relevant hearsay to be admitted in formal death penalty sentencing hearings we would destroy the requirement of I.C.R. 32(e)(1) that hearsay included in presentence reports be only that which the presentence investigator believes is reliable. The practice would quickly become for hearsay to be offered at the hearing rather than through the presentence report. Therefore, we hold

that the letter should not have been admitted.

774 P.2d at 318–19.

Clearly, hearsay evidence presented in a presentence investigation report in the manner and in the form articulated in I.C. § 19–2516, Idaho Rules of Criminal Procedure §§ 32 and 33.1, and *State v. Charboneau* is appropriate at sentencing hearings.

All of the matters of which Paz complains, in asserting this error, were contained in the presentence investigation report and on the issue of hearsay are not inappropriate to be considered by the court.

V.

## TRIAL COURT'S FINDING OF "UTTER DISREGARD FOR HUMAN LIFE"

Paz's argument in asserting this error is primarily based upon the different language used in defining this aggravating element by this Court in the companion cases of *State v. Charboneau* and *State v. Fain*, and further argues that the two definitions themselves prove "unconstitutional vagueness" of this element.

We have dealt with the different language used in defining terms in *State v. Charboneau* and *State v. Fain*.

Different words used in different opinions thankfully do not approach the level of "unconstitutional vagueness" in and of themselves. The terms adopted by this Court in *Charboneau* have, as we have indicated, passed constitutional muster.

The court summarized the conduct of Mr. Paz in the Findings of the Court in considering the death penalty on this issue in the paragraph (4) of section VI as follows:

The Defendant intentionally shot Mr. Gould, whose back was to the Defendant, in the right shoulder at such an angle that the bullet traveled toward Mr. Gould's spine. Then, the defendant intentionally shot Mr. Bright in the left side of the chest in the heart area. Finally, the Defendant intentionally shot Mr. Page, as Mr. Page was attempting to flee for his safety. Beyond a reasonable doubt this Defendant has exhibited the

most callous disregard for human life and is a cold-blooded, pitiless killer.

The trial court used virtually the precise language of *State v. Osborn,* quoted in *State v. Charboneau,* in defining "utter disregard for human life."

The trial court did not err in this finding.

## VI.

### VICTIM IMPACT STATEMENT IN PRESENTENCING REPORT

■ Once again, this Court in *State v. Charboneau* dealt extensively with victim impact statements and victim impact evidence in connection with the sentencing process.

Justice Johnson therein thoroughly analyzed the implications of the opinion of the United States Supreme Court in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987).

In this case, the following statement was contained in the presentence investigation report:

Mr. Newt Bright—father of deceased victim, Gerry Bright—stated to this investigator that in lieu of everything, this individual should be put away for a long time. His son, Gerry, appeared to be getting his life together. He had his daughter living with him and a healthy relationship starting to grow. Newt Bright stated his son had a lot going for him, and it's a shame it had to end in such a violent manner.

One of the persons shot and wounded by Paz, Mr. Gould, was also interviewed by the presentence investigator who stated: "Mr. Gould feels he is lucky to be alive. Mr. Gould recommends that the court should give the death penalty to Mr. Paz."

The State urges that these are not statements as contemplated by *Booth v. Maryland* as being "victim impact statements." The State also argues that as *Booth* was a jury sentencing case it should be distinguished from this case.

The statements quoted above are without question "victim impact statements" as contemplated by *Booth v. Maryland.* The Supreme Court in that case characterized improper victim impact statements as follows:

The VIS [victim impact statement] in this case provided the jury with two types of information. First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family. Second, it set forth the family members' opinions and characterizations of the crimes and the defendant.... [W]e find this information is irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner.

482 U.S. at 502–03, 107 S.Ct. at 2533.

Both of the victims' statements contained in the presentence investigation report in this case meet the definition set out by the United States Supreme Court of a victim impact statement, and as such should not have been considered by the trial court in its sentencing decision.

This Court has already held, in *State v. Charboneau,* that *Booth* is not distinguishable due to Idaho's statute providing for capital sentencing by judge rather than by jury. "The risk of arbitrary and capricious decisions exists whether the sentence is determined by jury or judge." *Charboneau,* 116 Idaho at 150, 774 P.2d at 320. Clearly these victim impact statements violated the rule adopted by this Court in *State v. Charboneau.*

It is incumbent upon the trial courts to make certain that such statements are excised, even from the presentence investigation report. The statements in question should not have been considered by the judge at the sentencing hearing; to do so was error.

Counsel for Paz raised objections to the presentence investigation at the time of the hearing set for weighing aggravating and mitigating factors as follows:

MR. BISHOP: Your Honor, we object to the presentence report as being hearsay. We also object to it as being a

compilation of the victim's impact evidence, evidence which is not allowed under the United States Supreme Court decision in *Booth v. Maryland*. This was brought to the prosecutor's attention and there's been letters back and forth on February 24th and March 1st, in conjunction with that argument. The law of the State of Idaho has created a situation which prejudiced and that cannot be erased because of this situation. Under the law of Idaho it states that you must review the PSI or the presentence investigation and give it consideration. Yet this pre-sentence report violates my client's constitutional right by presenting evidence which would be unconstitutional and could not be held before this Court.

Sentence Hearing Transcript at 6–7.

The trial court, although not excising the statement of Mr. Bright, clearly denoted it to be a "hearsay" statement of the type complained of by counsel for Paz and indicated that it was not influencing the court:

COURT: And the Court also is to take into consideration the trial. The Court did hear the victims' version of the trial at the trial, other than for Mr. Bright's version. And that is the only matter that would be objectionable on that ground, with regard to the presentence investigation, would be contained on page 2 where Mr. Newt Bright, the father of the deceased victim Gerry Bright, stated to this investigator that in lieu of everything, this individual should be put away for a long time. And his son Gerry appeared to be getting his life together. He had his daughter living with him and a healthy relationship was starting to grow. Newt Bright stated his son had a lot going for him and it's a shame he had to end it in such a violent manner. That's the only portion of the presentence investigation that contains any matter relevant to this particular proceeding; that is, whether the death penalty should be imposed. And the Court only has, in this offense, three alternatives. An indeterminate life with a minimum of ten years to be served without eligibility for parole; a determinate life, which means that the defendant would remain incarcerated until he was commuted or died in the penitentiary; and then a death. And Mr. Newt Bright's comments, "put away the defendant for a long time,"—"This individual should be put away for a long time," is not an overly prejudicial or suggestive comment to the state or to this Court. And the Court does not find any prejudice being imposed by the victim's statement, impact statement by the father of the deceased, and also finds that to be in compliance with the law of the Supreme Court of Idaho.

Sentence Hearing Transcript at 11–12.

The court, in its conclusion that the victim impact statement was "in compliance with the law of the Supreme Court of Idaho," was in error.

■ The consideration of a victim impact statement in the context of a capital sentencing hearing is a violation of the Eighth Amendment to the federal Constitution. *Booth v. Maryland*. However, even failure to adhere to "strict compliance with the procedure for sentencing" does not require automatic reversal.

■ The United States Supreme Court in *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), recognized that the United States Constitution does permit harmless error in capital cases.

In March of 1990, the United States Supreme Court, in the case of *Clemons v. Mississippi*, ── U.S. ──, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (1990 WL 32663), made it clear that state courts could determine that harmless error had occurred during the sentencing proceedings.

These cases demonstrate an expansion of previous opinions by the United States Supreme Court since *Booth v. Maryland* as adopted by us in *State v. Charboneau*, and permits review by us for harmless error.

In order to find that a federal constitutional error is harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Recently, in

*Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), the Supreme Court held that admission of a pre-sentencing psychiatric examination conducted in violation of the Sixth Amendment right to counsel in a capital case did not constitute harmless error. The Court distinguished between Sixth Amendment violations which affected the entire criminal proceeding, and those where the constitutional violation is limited to the erroneous admission of a particular piece of evidence. It held that a Sixth Amendment violation which did not taint the proceeding as a whole did not require automatic reversal. Instead, the Court adopted a case by case analysis by the appellate court to determine whether the evidence in question might have affected the jury in the sentencing phase of a capital trial.

The Court in *Satterwhite* recognized that "the evaluation of the consequences of our error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer." *Id.*, 108 S.Ct. at 1798. This evaluation is aided in Idaho by the fact that capital sentencing is done by a judge, who must leave a written record of the sentencing decision. Therefore, we turn to the record of the sentencing hearing to examine the possibility that the judge was influenced by the inclusion of victim impact statements in imposing the death penalty.

The trial court specifically found that the statement by Mr. Bright was not prejudicial, as it recommended the defendant be "put away for a long time," a recommendation which represented the most lenient alternative available to the court in its sentencing decision. Therefore, it is clear from the record in this case that the statement did not influence the trial court in its decision to impose the death penalty.

The statement by Gould is more problematic. Gould recommended the death penalty, and the trial court did not make it clear what weight, if any, it was giving to that statement. Nevertheless, viewing the balance of aggravating and mitigating factors set out by the trial court, we are convinced beyond a reasonable doubt that Gould's statement did not influence the trial judge's decision whether to impose the death penalty.

The trial court is required by statute to make written findings weighing the aggravating and mitigating circumstances before deciding on the imposition of the death penalty. I.C. § 19–2515. In this case the court devoted nearly 30 pages of text to explaining the basis for its decision. The court found that this crime involved a clearly thought out and unprovoked attack in a restaurant filled with people who were not involved in the confrontation between the defendant and the victim. Without warning, Paz emptied his gun in the direction of Bright, Gould and Page, while patrons and employees ran for cover. Paz continued to pull the trigger even after the ammunition was spent. At trial, he showed no remorse; on the contrary, he read a prepared statement to the court to the effect that the killing was justified because he was verbally insulted by the victim.

Paz had also been involved in two previous crimes of serious bodily injury or death to unarmed victims. The pre-sentence investigation report in one of those incidents also indicated a lack of remorse. Paz's family indicated that he had a "hard-core" attitude, fighting behavior and a bad temper.

The trial court found that Paz has a propensity to commit murder, due to over-reaction to verbal confrontation, which will probably constitute a continuing threat to society.

Finally, in summarizing its reasons for imposing the death penalty, the court stated that its primary consideration was the protection of society. It found that the alternative of imposing an indeterminate life sentence was not feasible, because Paz had shown no indication of rehabilitation after previous fines, probation, incarceration and parole. The court found that he had not applied the vocational training, counselling and education he had received in previous efforts at rehabilitation.

In rejecting the possibility of a fixed life sentence, the court noted that there was a

high probability that Paz would remain unpredictable and irrational in overreacting to confrontation, and would likely kill fellow inmates if imprisoned. The judge noted that the prison population was just as much a part of the society which it was his duty to protect in reaching the sentencing decision.

In short, the court found that "[t]he supporting factors of the statutory aggravating circumstances found by this Court, clearly demonstrate that this Defendant is easily provoked, that he irrationally reacts to that provocation, that he justifies his irrational behavior and does not understand why society is shocked by his conduct. The defendant has not been rehabilitated or deterred by past efforts of society. Society has not been protected from this Defendant. It is obvious to this Court that this Defendant would kill again."

In reviewing this comprehensive record, we are convinced beyond a reasonable doubt that the two sentences ascribed to Gould in the presentence investigation report, describing his reaction to the crime and his recommendation of sentence, did not influence the trial court in its decision to impose the death penalty upon Paz. The error was therefore harmless, and the case need not be remanded for sentencing.

This decision should not be interpreted in any fashion to condone or permit victim impact statements in capital cases. Victim impact statements are clearly proscribed by *Booth v. Maryland* and *State v. Charboneau*. It is a rare capital case where the inclusion of a victim impact statement will not fatally flaw the entire sentencing procedure.

## VII.

### PRESENTENCE INVESTIGATION FROM PRIOR OREGON PROSECUTION

■ Paz asserts as error the fact that the presentence report in this action contained information from a prior manslaughter conviction in Oregon and further asserts this information was ruled inadmissible in the Oregon action.

A reading of *State v. Paz*, 31 Or.App. 851, 572 P.2d 1036 (1977), shows that the Court of Appeals of Oregon affirmed the trial court's suppression of two confessions of Paz obtained during custodial interrogation after Paz requested a lawyer.

Following this ruling the case was remanded to the trial court for further proceedings.

The data contained in the presentence report in the case at hand consisted of the Oregon presentence report following remand and a supplemental presentence report and psychological evaluation, and consisted, in part, of statements obtained by the presentence investigation from police. A general description of statements made by Paz to police concerning that crime was set forth.

These records were certified as the official Oregon state records and although hearsay, were appropriate to be included in the presentence report pursuant to our ruling in *Charboneau* and I.C. § 19–2516.

The records reflect the work of the Oregon presentence investigator prior to Paz's sentencing for manslaughter and were appropriate to provide the trial court in this case with a full perspective of the person on whom the court was to pass sentence.

## VIII.

### WHETHER THE APPELLATE REVIEW PROVISIONS OF I.C. § 19–2719 UNCONSTITUTIONALLY REQUIRE ONLY CAPITAL DEFENDANTS TO FILE POST–CONVICTION PETITIONS WITHIN 42 DAYS OF BEING SENTENCED

■ Paz relies for his state constitutional argument upon article 1, § 18 of the Idaho Constitution, which provides as follows:

### ARTICLE I

### DECLARATION OF RIGHTS

**§ 18. Justice to be freely and speedily administered.**—Courts of justice shall be open to every person, and a speedy

remedy afforded for every injury of person, property or character, and right and justice shall be administered without sale, denial, delay, or prejudice.

Counsel for Paz argues that "a speedy remedy" is assured for every "injury of person" and that curtailing the time frame to pursue that remedy is a denial of that basic right. This Court in *Jones v. State Bd. of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977), held that "nothing in article I, § 18, either explicitly or implicitly prohibits legislative modification of common law actions." 97 Idaho at 864, 555 P.2d at 404.

The legislature has seen fit to appropriately limit the time frame within which capital defendants could execute certain rights.

▮ Paz further urges that the 42 day time constraint for seeking relief under I.C. § 19–2719 violates the equal protection and due process clauses of the United States Constitution. The thrust of this argument is that the 42 day time constraint is simply not enough time to adequately identify and present the myriad of issues that could arise in any capital case. Paz argues that the effect of the time constraint is to deny the opportunity to develop new evidence or discover the same and thus effectively denies the right to counsel.

This Court previously addressed the constitutionality of I.C. § 19–2719 in *State v. Beam,* 115 Idaho 208, 766 P.2d 678 (1988),

*cert. denied,* 489 U.S. 1073, 109 S.Ct. 1360, 103 L.Ed.2d 827 (1989), where Paz's present counsel on behalf of appellant Beam raised the same arguments of a denial of equal protection. This Court in a detailed analysis of this issue in *State v. Beam* held that the expedited procedure for post-conviction review in capital cases had a rational basis and thus did not violate a capital petitioner's equal protection rights. *State v. Beam* is dispositive of this argument.

## IX.

## STATUTORY REVIEW OF DEATH SENTENCE

▮ Under the directive of I.C. § 19–2827,[3] this Court must review the imposition of the death penalty independent of any appeal to determine if the sentence of death was, (1) imposed on the influence of passion, prejudice, or any other arbitrary factor; (2) whether the evidence supports the judge's finding of a statutory aggravating circumstance; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.

The findings of the trial court in this case concerning its consideration of imposing the death penalty under I.C. § 19–2515 reflect a dispassionate evaluation of the circumstances surrounding the incident involved in this case, and demonstrate a thoughtful consideration by the court of all of the relevant evidence produced at the sentencing hearing. This record does not show any indication that the sentence was

**3.** 19–2827. Review of death sentences—Preservation of records.—(a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Idaho. The clerk of the trial court, within ten (10) days after receiving the transcript, shall transmit the entire record and transcript to the Supreme Court of Idaho and to the attorney general together with a notice prepared by the clerk and a report prepared by the trial judge setting forth the findings required by section 19–2515(d), Idaho Code, and such other matters concerning the sentence imposed as may be required by the Supreme Court. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a narrative statement of the judgment, the offense, and punishment prescribed. The report may be in the form of a standard questionnaire prepared and supplied by the Supreme Court of Idaho.

(b) The Supreme Court of Idaho shall consider the punishment as well as any errors enumerated by way of appeal.

(c) With regard to the sentence the court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether the evidence supports the judge's finding of a statutory aggravating circumstance form among those enumerated in section 19–2515, Idaho Code, and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

imposed under the influence of passion, prejudice, or any other arbitrary factor.

The record in this case supports the finding of aggravating circumstances set forth by the trial court as noted herein in section VI. The Court found that the acts of Paz involved a clearly thought out and unprovoked attack in a restaurant filled with innocent people who were not involved in any manner in the confrontation between the defendant and the victims. Paz emptied his gun in the direction of the three individuals with whom he had had words while patrons and employees sought cover. Paz continued to pull the trigger even after the gun was empty. In the course of the shooting, he continued to direct his assault toward one of the individuals who was attempting to flee the restaurant.

The trial court found Paz had demonstrated no remorse. He read a prepared statement to the court to the effect that the killing of Bright and the shooting of the others was justified because Paz was verbally insulted by Bright.

The trial court found that after the alleged "insult" Paz had finished eating his breakfast, had departed the restaurant where the "insult" had occurred, obtained a weapon from his motor vehicle, directed his companion to depart, and reentered the restaurant for the sole purpose of shooting Bright and his associates.

In summation, after its review of the record, the trial court stated: "beyond a reasonable doubt this defendant has exhibited the most callous disregard for human life and is a cold-blooded, pitiless killer." The record supports the court's findings and the court's conclusion of callous disregard for human life and that the defendant intended to cause the death of one or more persons. The aggravating circumstances found by the court were supported in detail by the record.

Lastly, as directed by the statute, we have reviewed prior cases to determine whether in this instance the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Having compared many other cases [4], the record in this case, the trial court's findings in support of the death penalty, and the presentence report, we conclude that the sentence imposed in this case is not disproportionate to other cases in which the imposition of the death penalty has been approved.

Accordingly, the judgment of the district court imposing the death penalty is affirmed.

BAKES, C.J., and BOYLE, J., concur.

BISTLINE, Justice, dissenting, and concurring in part in the separate opinion of Justice JOHNSON:

It is obvious upon reading the majority opinion that a great deal of thought went

**4.** *State v. Lankford,* 116 Idaho 860, 781 P.2d 197, *stay granted,* 490 U.S. 1061, 109 S.Ct. 2058, 104 L.Ed.2d 623 (1989); *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989); *McKinney v. State,* 115 Idaho 1125, 772 P.2d 1219 (1989); *State v. Fetterly,* 115 Idaho 231, 766 P.2d 701 (1988); *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985), *cert. denied,* 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985), *cert. denied,* 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202 (1985), *cert. denied,* 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985); *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1985); *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985); *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984); *State v. McKinney,* 107 Idaho 180, 687 P.2d 570 (1984); *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983); *State v. Major,* 105 Idaho 4, 665 P.2d 703 (1983); *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336, *cert. denied,* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Carter,* 103 Idaho 917, 655 P.2d 434 (1981); *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982); *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981); *State v. Griffiths,* 101 Idaho 163, 610 P.2d 522 (1980); *State v. Padilla,* 101 Idaho 713, 620 P.2d 286 (1980); *State v. Fuchs,* 100 Idaho 341, 597 P.2d 227 (1979); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979).

into its crafting. Nevertheless, for reasons which will be discussed below, I must respectfully dissent from the majority's opinion as it concerns both the conviction and the sentencing of Federico Paz.

## I. THE EXCLUSION OF HISPANICS FROM THE JURY POOL

*Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1978), reaffirmed a criminal defendant's right to a jury of peers drawn from a "fair and reasonable representation of the community." In order to justify the reversal of a conviction on the grounds that the jury failed to represent such a cross-section of the community, a defendant must make a three-pronged showing:

> 1) [T]hat the group alleged to be excluded is a 'distinctive' group in the community; 2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and 3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

*Duren,* 439 U.S. at 364, 99 S.Ct. at 668. Once such a prima facie showing is made, the burden shifts to the state to show "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.,* 439 U.S. at 367–68, 99 S.Ct. at 670.

The majority has apparently concluded that Paz made his prima facie case under *Duren.* That conclusion is not disputed. Where the majority and I part company is in its determination that the state will not be required to meet its rebuttal burden under *Duren* because "it would be a manifest miscarriage of justice if the state jury selection system was overturned due to the reliance by the State upon Paz's failure to

make out a prima facie case of underrepresentation." 118 Idaho at 552, 798 P.2d at 11.

In support of its position, the majority has cited a number of cases for variations on the theme that an appellate court is not restricted to considering only the theories raised by the parties if to do so "would result in a miscarriage of justice." 118 Idaho at 551, 798 P.2d at 10. Unfortunately, the majority's application of the principle of these cases to the situation at hand is untenable. With one minor exception, *every* case cited by the majority is a *civil* case.[5] The case before us is, obviously, a *capital criminal* case. Contrary to the apparent majority belief, civil precedent, no matter how well-reasoned, cannot simply be transposed wholesale into the criminal context. The two traditions are vastly different. They serve different purposes, and the rules which govern each are also vastly different. To assume, as the majority does here, that civil and criminal precedents are interchangeable, is to totally ignore those great differences.

In the criminal context, error which was not raised at trial cannot be raised on appeal unless it constitutes fundamental error. *See State v. Cariaga,* 95 Idaho 900, 523 P.2d 32 (1974); *State v. Haggard,* 94 Idaho 249, 486 P.2d 260 (1971). Where fundamental error appears in the record, this Court will consider it even though no objection was raised at trial. *Id.* Error is fundamental when it "goes to the foundation or basis of a defendant's rights or ... to the foundation of the case or take[s] from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *Smith v. State,* 94 Idaho 469, 475 n. 13, 491 P.2d 733, 739 n. 13 (1971), *quoting State v. Garcia,* 46 N.M. 302, 309, 128 P.2d 459, 462 (1942). Clearly the fundamental error doctrine focuses upon the right of the *defendant* to a fair trial. To my knowledge, no court has held that trial error committed by

---

5. Even the one criminal case which is cited does not support the majority's position on this issue. *See State v. Hickmann,* 273 Or. 358, 540 P.2d 1406, 1407 (1975) ("Since the State did not rely upon 'consent' as a basis to justify the warrant-

less search at the trial court level or on appeal, the decision of the Court of Appeals [remanding to the trial court for findings on the issue of consent] is reversed.")

*the state* can constitute fundamental error, the commission of which operates to the benefit of the state and to a defendant's detriment. The failure of the state to present *any* evidence at trial to fulfill its *Duren*-imposed rebuttal burden is definitely *not* fundamental error. To paraphrase a maxim popular among support staff: "Failure to present evidence on the state's part does not constitute manifest injustice on the Court's part."

As the majority acknowledges, "[t]he State ran a very substantial risk in relying solely on its claim that Paz failed to establish a prima facie case." 118 Idaho at 551, 798 P.2d at 10. The State ran the risk, and it lost. It is wholly inappropriate for this Court to become the State's insurer in the name of manifest injustice.

## II. THE VAGUENESS OF "AGGRAVATING CIRCUMSTANCES"

Here I stand by my dissent in *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989). The majority refuses to tailor the statutorily prescribed aggravating circumstances in any way that would provide guidance to sentencing judges attempting to avoid the "arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980). The result of this judicial abdication is that sentencing judges have no assistance from this Court in determining "what sets [a] particular murder apart—not from other crimes—but from the 'norm' of *first degree murder?*" *Charboneau*, 116 Idaho at 171, 774 P.2d at 341 (Bistline, J., dissenting). "Utter disregard for human life" and "especially heinous, atrocious or cruel manifesting exceptional depravity," as those terms have been defined by the majority, are "nothing more than kitchen sink aggravating circumstances which enable the state to make *every* first degree murderer not just a candidate for, but an actual recipient of, the harshest and most final of all criminal penalties." *Id.*, 116 Idaho at 172, 774 P.2d at 342.

## III. CONSIDERATION OF THE VICTIM IMPACT STATEMENT AT SENTENCING

On this issue I am in agreement with Justice Johnson. Permitting errors in capital cases to be reviewed under the harmless error standard will only accentuate the problem with lack of guidance for district judges which has already been discussed herein. The Court in *Charboneau* recognized this fact when it stated:

> In a matter as awesome as the decision whether to impose the death penalty, a strict compliance with the procedures for sentencing is required. *Even a well intentioned and conscientious effort by the trial court to avoid considering the hearsay contained in the letter does not suffice.*

*State v. Charboneau*, 116 Idaho 129, 149, 774 P.2d 299, 319 (1989) (emphasis added). The retreat from this position engineered by the majority in today's opinion is unfortunate.

## IV. THE CONSIDERATION OF EVIDENCE PREVIOUSLY RULED INADMISSIBLE IN AN OREGON PROCEEDING

Part VII of the majority opinion asserts that none of the evidence suppressed in *Oregon v. Paz*, 31 Or.App. 851, 572 P.2d 1036 (1977), was included in the presentence report considered by the trial court in the instant case against Paz. I disagree, and concur instead in Justice Johnson's analysis of this issue, which points out both that evidence was included in the presentence report and that the trial court's consideration of the evidence is apparent.

## V. THE CONSTITUTIONALITY OF THE TIME LIMITS IN I.C. § 19–2719

Concern that the 42–day limit of I.C. § 19–2719 would have a devastating affect upon the ability of attorneys to effectively raise and address all of the possible issues in capital cases was first raised in *State v. Beam*, 115 Idaho 208, 223, 766 P.2d 678, 693 (1988) (Bistline, J. dissenting). Given the current efforts to diminish the availability of federal habeas corpus relief, and recent United States Supreme Court deci-

sions which foreclose argument on certain issues, *see, e.g., Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), this concern is even more urgent. As the number of appeal opportunities available to persons sentenced to death grows fewer, it will be increasingly important for them to make the best use of the remaining opportunities by finding all appealable issues at the outset and framing their arguments on those issues effectively. The 42–day limit of I.C. § 19–2719 does not afford defendants anywhere near adequate time to do so. The statute's time limit is yet another enhancement of the risk that an arbitrary and capricious decision to impose the death penalty will be made and carried out. As such, the time limit violates the eighth and fourteenth amendments to the United States Constitution and art. I, §§ 6 and 13 of the Idaho Constitution.

## VI. CONCLUSION

For all of the foregoing reasons, both Paz's conviction and his sentence should be vacated and the cause should be remanded to the trial court.

JOHNSON, Justice, concurring and dissenting.

I concur with all of the majority opinion except part VI (VICTIM IMPACT STATEMENT IN PRESENTENCING REPORT), and part VII (PRESENTENCE INVESTIGATION FROM PRIOR OREGON PROSECUTION). From those parts, I respectfully dissent.

### I.

THE UNITED STATES SUPREME COURT HAS NOT REQUIRED THE APPLICATION OF THE HARMLESS ERROR RULE IN DEATH PENALTY SENTENCING, BUT HAS ONLY ALLOWED IT TO BE USED BY THE STATES. THE HARMLESS ERROR RULE SHOULD NOT APPLY TO THE TRIAL COURT'S ERROR IN CONSIDERING THE VICTIM IMPACT STATEMENTS.

As to part VI, I cannot agree that the harmless error rule should be applied to the trial court's error in considering the victim impact statements.

The United States Supreme Court has not required states to use the harmless error rule in death penalty sentencing cases. In *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284, 294 (1988), the Court specifically pointed out that the application of the harmless error rule in state death penalty sentencing case is permissive:

> We have *permitted* harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial.

(Emphasis added.)

On March 28, 1990, the United States Supreme Court made it clear that whether a state uses the harmless error doctrine in death penalty sentencing cases where violations of federal constitutional rights are involved is a decision to be made by the appellate courts of the state. In *Clemons v. Mississippi,* —— U.S. ——, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (citing *Satterwhite*), the Court vacated a death penalty sentence and said that "it was open to the Mississippi Supreme Court to find that the error which occurred during the sentencing proceeding was harmless." Later in the opinion, the Court made the meaning of this statement clear:

> *Nothing in this opinion is intended to convey the impression that state appellate courts are required to or necessarily should engage in ... harmless error analysis when errors have occurred in a capital sentencing proceeding. Our holding is only that such procedures are constitutionally permissible.*

110 S.Ct. at 1451 (emphasis added).

In *State v. Charboneau,* 116 Idaho 129, 149, 774 P.2d 299, 319 (1989), in vacating a death sentence, in part because it was a violation of the hearsay rule for the trial court to admit a letter written by the victim's father, I said:

In a matter as awesome as the decision whether to impose the death penalty, a *strict compliance* with the procedures for sentencing is required. Even a well intentioned and conscientious effort by the trial court to avoid considering the hearsay contained in the letter does not suffice. (Emphasis added.)

However, only Justice Huntley concurred in this portion of the opinion. Justices Bakes and Bistline concurred in the result only as to this portion. Therefore, the strict compliance requirement is not controlling precedent. In my view, this rule of strict compliance in death penalty sentencing about which I wrote in *Charboneau* is directly applicable to the victim impact statements in. this case. I am unable to understand how we can harmonize this rule of strict compliance with the harmless error rule employed by the majority here.

There can be no doubt that the trial court considered the verboten victim impact statements. The findings of the trial court in considering the death penalty contain the statement: "The Court had considered the pre-sentence investigation,...." I am not prepared to assume that the trial court did not do what it said it did—consider the pre-sentence investigation, which contained the victim impact statements.

Also, the trial court's statement of facts found in aggravation stated: "At the aggravation/mitigation hearing, even though the Defendant had notice of those matters contained in the pre-sentence investigation report, he did not request the presence of those people to testify." I am not prepared to assume that the trial court did not intend to refer to the victim's father and Mr. Gould, the two whose statements the majority agrees were prohibited victim impact statements. The only implication I can draw from this finding of the trial court is that if the content of the victim impact statements was to be rebutted, it was the burden of Paz to call for cross-examination of those who made them. Certainly, this is an indication that the trial court considered the victim impact statements along with the other matter contained in the pre-sentence investigation report. Otherwise, why

would the trial court offer Paz an opportunity to rebut their statements?

The very process of rebuttal was one of the concerns the Court had in *Booth v. Maryland*:

We also note that it would be difficult—if not impossible—to provide a fair opportunity to rebut such evidence without shifting the focus of the sentencing hearing away from the defendant. A threshold problem is that victim impact information is not easily susceptible to rebuttal. Presumably the defendant would have the right to cross-examine the declarants, but he rarely would be able to show that the family members have exaggerated the degree of sleeplessness, depression, or emotional trauma suffered. Moreover, if the state is permitted to introduce evidence of the victim's personal qualities, it cannot be doubted that the defendant also must be given the chance to rebut this evidence. Putting aside the strategic risks of attacking the victim's character before the jury, in appropriate cases the defendant presumably would be permitted to put on evidence that the victim was of dubious moral character, was unpopular, or was ostracized from his family. The prospect of a "mini-trial" on the victim's character is more than simply unappealing; it could well distract the sentencing jury from its constitutionally required task—determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime.

482 U.S. 496, 506–07, 107 S.Ct. 2529, 2535, 96 L.Ed.2d 440, 450–51 (1987) (citations and footnote omitted).

I also note that in the pre-sentence investigation report that is part of the record in this case the words "death penalty," contained in Mr. Gould's statement recommending that the trial court should give Paz the death penalty, are underlined in red ink, apparently by the trial court.

I would require the trial court in sentencing a defendant in a death penalty case to comply strictly with the requirement of *Booth v. Maryland* that victim impact

statements not be considered. Although there is no specific reference to the consideration the trial court gave to these statements, the risk identified in *Booth v. Maryland* remains—"an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." 482 U.S. at 505, 107 S.Ct. at 2534, 96 L.Ed.2d at 450.

## II.

### THE OREGON PRESENTENCE INVESTIGATION INCLUDED EVIDENCE THAT WAS SUPPRESSED BY THE OREGON COURT OF APPEALS.

As to part VII of the majority opinion, I am unable to agree that none of the evidence that was suppressed by the Oregon Court of Appeals in *State v. Paz*, 572 P.2d 1036 (Or.Ct.App.1977), was included in the Oregon presentence report.

In its decision affirming the trial court's suppression of Paz's 1977 statements, the Oregon Court of Appeals pointed out that "the trial court found that the police should have ceased questioning defendant after his request for an attorney at the polygraph test." 572 P.2d at 1045. It was the questioning that occurred after this request that was suppressed. The Oregon presentence report that was included in the presentence report in this case included the following information that Paz told the police after his request for an attorney at the polygraph test:

> In interviews with police, the defendant *initially gave various versions* of his activities prior to the instant offense. However, following a polygraph examination, defendant stated he would tell authorities what had occurred. He indicated that on approximately 2.4.77 the above-noted *altercation* had occurred with victim Villalobos present. Defendant professed that the *following day he purchased a knife* at a surplus store because *he felt threatened as a result of the disagreement* with Martinez and victim Villalobos. Defendant went on to relate that, on the morning of 2.12.77, defendant and a *friend went to the basement* of the Bean Complex where the defendant assisted his friend in making a

> long distance collect telephone call. While the friend was talking on the phone, defendant was sitting on a ping pong table; and after a while, *defendant went to his own room where he obtained his knife because* he wanted to carve his name into one of the ping pong tables. At his friend's request the defendant then took the phone and talked to the party in Medford for a short time before hanging up. Defendant's friend then summoned defendant to the adjacent television viewing room where the friend was reportedly *awakening a female student who then went to her room.* After she *left, defendant told police he was standing at the back of the room when he first saw the victim raise up and look over the back of a couch on the left side of the room. Defendant stated that, when he saw the victim raise himself off the couch, he felt the victim had a bottle so he took out his knife and went up and stabbed the victim as the victim was trying to get up.* The defendant demonstrated to police the manner in which he had stabbed the victim and stated that he felt he may have stabbed the victim *about three times. Police asked if there had been any verbal exchange between defendant and victim just prior to the stabbing, and defendant advised, "No, I just walked up and stabbed him."* Defendant then related that the victim had screamed and ran from the room. When asked *why he had stabbed the victim, defendant stated, "I thought he was coming after me so I got him as he was trying to get up." Defendant acknowledged to police that, while he felt the victim might have been holding something, he saw nothing in the victim's hands.*

(The underlined portion of this part of the presentence investigation report is underlined in red ink on the report, apparently by the trial court.)

Much of this information received from Paz by the Oregon police that was suppressed by the Oregon courts was used verbatim by the trial court in its facts

found in aggravation in this case. R. 443–44.

In stating the reasons why the death penalty was imposed, the trial court referred to "past conduct." R. 458.

### III.

### CONCLUSION.

I would vacate the sentence and remand the case for resentencing before a different district judge.

### DISSENT FROM DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice, dissenting from the Denial of the Petition for Rehearing.

The motion for a rehearing should be granted. Obviously the authority presented in the two dissents filed by Justice Johnson and myself did not gain a response from any of the three justices who comprise the majority, from which it follows that the same were deemed of no moment. That is an acceptable fact of life. But it is not acceptable that the majority does not deign to make *any* response to the defendant's sole spokesman, Mr. Van Bishop.

### I. THE EXCLUSION OF HISPANICS FROM THE JURY POOL

*Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1978), reaffirmed a criminal defendant's right to a jury of peers drawn from a "fair and reasonable representation of the community." Once the defendant makes a prima facie showing that the jury failed to represent a cross-section of the community, the burden shifts to the state to show "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.*, 439 U.S. at 367–68, 99 S.Ct. at 670.

The majority concluded that Paz made his prima facie case under *Duren*. That conclusion is not disputed. Where the majority and I part company is in its determi-nation that the state will not be required to meet its rebuttal burden under *Duren* because "it would be a manifest miscarriage of justice if the state jury selection system was overturned due to the reliance by the State upon Paz's failure to make out a prima facie case of underrepresentation." 118 Idaho at 552, 798 P.2d at 11.

In the criminal context, error which was not raised at trial cannot be raised on appeal unless it constitutes fundamental error. *See State v. Cariaga*, 95 Idaho 900, 523 P.2d 32 (1974); *State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971). Error is fundamental when it "goes to the foundation or basis of a defendant's rights or ... to the foundation of the case or take[s] from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *Smith v. State*, 94 Idaho 469, 475 n. 13, 491 P.2d 733, 739 n. 13 (1971), *quoting State v. Garcia*, 46 N.M. 302, 309, 128 P.2d 459, 462 (1942). Clearly the fundamental error doctrine focuses upon the right of the *defendant* to a fair trial. To my knowledge, no court has held that trial error committed by *the state* can constitute fundamental error, the commission of which operates to the benefit of the state and to a defendant's detriment. The failure of the state to present *any* evidence at trial to fulfill its *Duren*-imposed rebuttal burden is definitely *not* fundamental error. To paraphrase a popular maxim: The State's failure to present evidence does not rise to a manifest injustice.

### II. THE VAGUENESS OF "AGGRAVATING CIRCUMSTANCES"

The majority refuses to tailor the statutorily prescribed aggravating circumstances in any way that would provide guidance to sentencing judges attempting to avoid the "arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980). The result of this judicial abdication is that sentencing judges have no assistance from this Court in determining "what sets [a] particular murder apart—not from other crimes—but

from the 'norm' of *first degree murder?*" *Charboneau,* 116 Idaho at 171, 774 P.2d at 341 (Bistline, J., dissenting). "Utter disregard for human life" and "especially heinous, atrocious or cruel manifesting exceptional depravity," as those terms have been defined by the majority, are "nothing more than kitchen sink aggravating circumstances which enable the state to make *every* first degree murderer not just a candidate for, but an actual recipient of, the harshest and most final of all criminal penalties." *Id.,* 116 Idaho at 172, 774 P.2d at 342.

### III. CONSIDERATION OF THE VICTIM IMPACT STATEMENT AT SENTENCING

Permitting errors in capital cases to be reviewed under the harmless error standard will only serve to accentuate the problem with lack of guidance for district judges. The Court in *Charboneau* recognized this fact when it stated:

> In a matter as awesome as the decision whether to impose the death penalty, a strict compliance with the procedures for sentencing is required. *Even a well intentioned and conscientious effort by the trial court to avoid considering the hearsay contained in the letter does not suffice.*

*State v. Charboneau,* 116 Idaho 129, 149, 774 P.2d 299, 319 (1989) (emphasis added).

### IV. CONSIDERATION OF EVIDENCE PREVIOUSLY RULED INADMISSIBLE IN AN OREGON PROCEEDING

Part VII of the majority opinion asserts that none of the evidence suppressed in *Oregon v. Paz,* 31 Or.App. 851, 572 P.2d 1036 (1977), was included in the presentence report considered by the trial court in the instant case against Paz. Justice Johnson's analysis of this issue points out both that evidence was included in the presentence report and that the trial court's consideration of the evidence is apparent.

### V. THE CONSTITUTIONALITY OF THE TIME LIMITS IN I.C. § 19–2719

Concern that the 42–day limit of I.C. § 19–2719 would have a devastating affect upon the ability of attorneys to effectively raise and address all of the possible issues in capital cases was first raised in *State v. Beam,* 115 Idaho 208, 223, 766 P.2d 678, 693 (1988) (Bistline, J., dissenting). Given the current efforts to diminish the availability of federal habeas corpus relief, and recent United States Supreme Court decisions which foreclose argument on certain issues, *see, e.g., Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), this concern is even more urgent. As the number of appeal opportunities available to persons sentenced to death diminishes it will be increasingly important there be made the best use of the remaining opportunities by finding all appealable issues at the outset and framing the arguments on those issues effectively. The 42–day limit of I.C. § 19–2719 does not afford defendants anywhere near adequate time to do so. The statute's time limit is yet another enhancement of the risk that an arbitrary and capricious decision to impose the death penalty will be made and carried out. As such, the time limit violates the eighth and fourteenth amendments to the United States Constitution and art. I, §§ 6 and 13 of the Idaho Constitution.

### VI. CONCLUSION

The Court had abdicated its duty in failing to controvert or even address the arguments outlined above, notwithstanding the clarity and unusual force with which the Public Defender presented them in his brief. Rehearing should be granted, thus giving the Court a chance to right itself.